453 A.2d 931
COMMONWEALTH of Pennsylvania
v.
William David BACHERT, Appellant.

COMMONWEALTH of Pennsylvania, Appellant,
v.
William David BACHERT.

Supreme Court of Pennsylvania.

Submitted Oct. 21, 1982.
Decided Dec. 17, 1982.
Filed Dec. 17, 1982.

400

Ronald J. Wydo, Bernard J. Kotulak, II, Wilkes-Barre, for William Bachert.

Chester B. Muroski, Dist. Atty., Joseph P. Giovannini, Jr., Luzerne Co., Asst. Dist. Atty., for Commonwealth.

Before O'BRIEN, C.J., and ROBERTS, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On June 2, 1977, William David Bachert was convicted by a jury of murder of the first degree, robbery, kidnapping, theft, and conspiracy to commit murder, kidnapping, robbery and theft. On appeal to the Superior Court,[1] Special Transfer Docket, the judgment of sentence of murder of the first degree was vacated and the case was remanded for a new trial at which the degree of guilt was not to rise higher than murder of the second degree. All other judgments of sentence were affirmed. *Pro se* allegations of ineffective assistance of trial counsel, who represented defendant on appeal, were remanded to the trial court with directions to appoint counsel to pursue defendant's *pro se* allegations. From this order, both the defendant and the Commonwealth filed petitions for allowance of appeal, both of which were granted.

The Commonwealth challenges the Superior Court's determination that there was insufficient evidence to support a conviction of murder of the first degree, specifically with regard to the element of "intent to kill."

■ It is well established that the test of sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, and drawing all proper inferences favorable to the Commonwealth, the trier of fact could reasonably have determined all elements of the crime to have been established beyond a

1. *Commonwealth v. Bachert,* 271 Pa.Super. 72, 412 A.2d 580 (1979).

reasonable doubt. *Commonwealth v. Coccioletti,* 493 Pa. 103, 425 A.2d 387 (1981). The evidence, viewed in this manner, establishes the following.

The defendant and his cohort, Charles Webber (herein Webber), spent much of February 1, 1977 drinking beer and whiskey in Pottsville, Schuylkill County, eventually driving off in Webber's van, traveling north on Route 61 to Interstate Route 81. The van either broke down or was parked on the right hand side of Route 61. Shortly after 6:30 P.M., a passing motorist saw the van and two men, one of whom she identified as Webber, who was hitchhiking at that time. The van was again observed in the early morning hours of February 2 in the same location by a state trooper who confirmed that it was registered in Webber's name.

At approximately 6:45 P.M. on February 1, the victim, Thomas Welsh, left his home in Port Carbon to drive north to Shenandoah to officiate a volleyball game. He drove his 1973 Chevrolet Impala, equipped with a citizen's band radio, in the direction of Route 61, which is the principal route from Port Carbon to Shenandoah. The victim, who normally would have reached the volleyball game at about 7:00 P.M. or 7:15 P.M., never arrived.

The victim passed the defendant and Webber on Route 61 on his way to Shenandoah and offered them a ride. Webber, armed with a 9 mm. Luger semi-automatic pistol, and defendant forced him to drive onto Interstate 81 North, proceeding forty and one-half miles to the exit for the Cross Valley Expressway connecting Interstate 81 with the City of Nanticoke, Luzerne County.

At approximately 8:00 P.M., the victim was observed by passing motorists on the Cross Valley Expressway near the entrance to Interstate 81 clenching his chest, staggering, and falling to one knee. Also at 8:00 P.M., a young couple were driving on the Cross Valley Expressway and were approaching the entrance to Interstate 81 when they spotted an "obstacle" in the road. The car straddled the obstacle which lodged beneath the car between the left and right tires. They drove the car to the side of the road, dragging

the obstacle beneath the car. Discovering that the obstacle was the victim, they jacked the car to relieve any pressure, called for an ambulance, and waited for help.

The victim was still alive and was heard to moan and complain of the cold but ultimately lost consciousness and was pronounced dead at 8:55 P.M. at the local hospital. He had three gunshot wounds, one of the chest, one of the right arm, and one of the left buttock.

The Coroner testified that the victim died of shock due to loss of blood, resulting from the gunshot wound of the chest, and that there were no crushing injuries to the body which would have occurred had the victim been run over by the automobile. There were lacerations and abrasions to the face, chest, arms, and legs, which, absent the gunshot wounds, would not have proved fatal. That the victim's wounds were inflicted by Webber's gun, found in his possession when arrested later that night, was established by a ballistics expert's testimony.

Webber and the defendant spent the late evening of February 1 drinking in a bar in Nanticoke, where they became acquainted with four other men. At about 1:30 A.M. on February 2, defendant, Webber, and the four men left the bar and drove the victim's car and a van to the coal strippings outside Nanticoke where they drank beer and smoked marijuana in the van. While there, Webber attempted to sell the victim's car. No one present being capable of paying even the nominal sum Webber sought, Webber was asked why he would sell it for so little. In response, Webber and defendant admitted that the car was stolen and that they had shot a man. At trial, three of the four other men testified that defendant repeatedly said "We shot a guy." Following the admission as to the shooting, and apparently sensing disbelief from the group, Webber pulled the handgun from his belt, displayed it and removed the clip which still contained two live cartridges. He ejected a third cartridge from the chamber, and counted these three remaining cartridges, implicitly noting the absence of three already-fired cartridges. When one of the four, Cyron,

asked to handle the gun, Webber was reluctant but was persuaded by another who stated "Go ahead and let him see it because he was in prison for firearms already." Thereafter, Webber again attempted to sell the car, and, there being no offers received, asserted that he would just "blow it up" as it was of no use to him. After careening through the banks of the stripping area and leaving the car stranded, Webber returned to the van, sold the car's citizen band radio to one of the four, and the group planned means of aiding Webber and the defendant in stealing another car. They left the area, eventually heading toward Wilkes Barre.

The defendant, Webber, and one of the four, Wilushewski, were dropped off. Eventually, these three attracted police attention and were arrested in Wilkes Barre and taken to police headquarters, the defendant and Wilushewski riding in a police van, Webber in a police cruiser. During the ride to headquarters, the defendant was quoted as saying: "I hope you know we are both in trouble now, so if you want to, stick up for yourself, or if you want to, help us out because we stole a car tonight and we shot a guy, we wasted a guy." The defendant then explained that he and Webber were hitchhiking when they were picked up by the victim, and that they compelled him to drive north on Interstate 81, ordered him to take an exit, told him to get out of the car, and that Webber shot him. Defendant then asked Wilushewski to aid him in fabricating an alibi that he was with the defendant in the bar in Nanticoke all afternoon and evening. Wilushewski refused and relayed this entire conversation to the police when he was removed from the police van.

The Commonwealth argues, first, that the Superior Court erred in declaring the evidence to be insufficient to establish guilt of murder of the first degree, and second, that the Superior Court erred in remanding for a new trial when the proper remedy was merely instatement, as a matter of law, of a conviction of murder of the second degree where the evidence amply established felony murder. Due to our resolution of the issue regarding sufficiency of the evidence,

and reversal of the order of the Superior Court, we need not address the Commonwealth's second argument.

■■■ Whether the defendant's repeated admissions that "We shot a guy" sufficiently constitute proof of a specific intent to kill, harbored by the defendant at the time of the shooting, is the issue to be resolved. To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one which the accomplice harbored and cannot depend upon proof of intent to kill only in the principal. LaFave and Scott, *Criminal Law*, 1972. "[A] person is not guilty of an offense unless he acted intentionally, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." 18 Pa.C.S.A. § 302(a). The trier of fact found that the defendant had the requisite mental state to convict of murder of the first degree and other charges. Such resolution of factual issues is solely within the province of the jury and an appellate court will not disturb the jury's findings when there is support in the record for the verdict. *Commonwealth v. Mumma*, 489 Pa. 547, 414 A.2d 1026 (1980).

■■■ The existence of a shared criminal intent between the principal and his accomplice may be inferred from the circumstances or acts of the slayer and accomplice committed shortly after the slaying. In *Commonwealth v. Waters*, 491 Pa. 85, 418 A.2d 312 (1980), we held that existence of a common design between felons to commit the underlying felony of felony murder may be established by an *inference* arising from the circumstances or acts committed shortly after the slaying. In *Commonwealth v. Craig*, 471 Pa. 310, 370 A.2d 317 (1977) and *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976) it was held that specific intent to kill may be found from a defendant's words or conduct or from attendant circumstances together with all reasonable inferences therefrom.

■ Proof of mental state is quite often difficult, and the evidence here, relevant to whether defendant bore the intent requisite to murder of the first degree, is circumstantial. In the context of the events and conversation in the van, defendant's repeated boasting statements that "*We* shot a guy," constitute an admission of complicity in that act; one who revolted from the act would not attempt to vaunt oneself in the eyes of peers by admissions of complicity. Furthermore, defendant's admissions in the police van to Wilushewski again ratify defendant's earlier participation in the murder. Specifically, he said to Wilushewski, "I hope you know we are both in trouble now, so if you want to, stick up for yourself, or if you want to, help us out because *we* stole a car tonight and *we* shot a guy, *we* wasted a guy." (Emphasis added.) At this point, aware of the imminence of interrogation, a time at which we might expect that an accomplice would begin to reassess earlier events, view them in a different light, and assert a lack of complicity, the defendant still admitted that he participated in and shared responsibility for the murder. These admissions of participation, declarations against penal interest, permit an inference, by the jury, of the existence of the requisite intent to kill.

■ Accordingly, the absence of direct evidence as to what occurred in the victim's car prior to and at the time the victim was forced out and shot, does not preclude a finding by the jury of culpability in the defendant, as inferred from his acts and words subsequent to the murder. Culpability as an accomplice is established by proof that the defendant, with the intent to promote or facilitate the commission of the offense, did aid or attempt to aid in the commission of the offense. 18 Pa.C.S.A. 306(c). Presented with defendant's admissions that "We stole a car" and "We shot a guy," admissions of participation, it was reasonable for the jury to infer that defendant's participation was, at a minimum, with the intent of facilitating the commission of the murder. Thus, that part of the order of the Superior Court vacating the judgement of sentence as to murder of the first degree,

and remanding for a new trial, is reversed, and the judgement of sentence of the trial court is reinstated.

Turning to the issues raised in defendant's appeal, we address first the argument that the trial court's refusal to grant appellant's motion for a change of venue due to pre-trial publicity was error, and constituted a denial of due process. Prior to defendant's trial, his cohort Webber was tried independently. Webber's trial, and Webber's eventual entry of a plea of guilty to murder of the second degree, as well as the earlier progress of investigation of the crime, were covered by the various news media.

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the United States Supreme Court clarified the approach to reviewing a claimed denial of due process in the selection of a jury due to prejudicial pre-trial publicity. Because of apparent confusion in the federal courts regarding the import of the holding of *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) the United States Supreme Court emphasized that the Constitution requires that the conviction be set aside only where there is a showing of "actual prejudice" in the jury panel and that the holding in *Marshall v. United States, Id.,* that persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced, was an exercise of the Court's " 'supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts,' and not as a matter of constitutional compulsion." *Murphy v. Florida, supra,* 421 U.S. at 797, 95 S.Ct. 2031 at 2034, 44 L.Ed.2d at 593 *quoting Marshall v. United States, supra,* 360 U.S. at 313, 79 S.Ct. 1171 at 1173, 3 L.Ed.2d at 1252.

Further emphasized in *Murphy v. Florida, supra,* was that the basis for the order of a new trial in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), was that [E]ight of the 12 jurors had formed an opinion that the defendant was guilty before the trial began; some went "so far as to say that it would take evidence to overcome their belief" in his guilt. . . . In these circumstances, the

Court readily found *actual prejudice* against the petitioner to a degree that rendered a fair trial impossible.

*Murphy v. Florida, supra,* 421 U.S. at 798, 95 S.Ct. 2031 at 2034, 44 L.Ed.2d at 594 (emphasis supplied) (citation omitted).

■ Correspondingly, the law of this Commonwealth places the burden of proof, as to showing prejudice, upon the challenger to venue. As we stated in *Commonwealth v. Casper,* "[O]ne who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury," *Id.,* 481 Pa. 143, 150, 392 A.2d 287, 291 (1978), *citing Murphy v. Florida, supra* and "[i]n reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity." *Commonwealth v. Casper, supra,* 481 Pa. at 150, 392 A.2d at 291, *quoting Commonwealth v. Kichline,* 468 Pa. 265, 274, 361 A.2d 282, 287 (1976).

■ The role of the trial judge during voir dire is as arbiter of a mixed question of fact and law, and that the canvassing of prospective jurors for the possibility of a hardened opinion in derogation of the constitutional imperative of trial by "impartial, 'indifferent' jurors," *Irvin v. Dowd, supra,* 366 U.S. at 722, 81 S.Ct. 1639 at 1642, 6 L.Ed.2d at 755, is to be performed before the trial judge is not an empty requirement. The opportunity to observe the demeanor of the prospective juror and the tenor of the juror's answers is indispensable to the judge in determining whether a fair trial can be had in the community. Claims of impartiality by prospective jurors are subject to scrutiny for credibility and reliability as is any testimony and the judgment of the trial court is necessarily accorded great weight. As stated in *United States v. Wood:*

Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

*Id.* 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78, 87 (1936) *reaffirmed in Irvin v. Dowd, supra* 366 U.S. at 725–726, 81 S.Ct. 1639 at 1644, 6 L.Ed.2d at 757. "After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only have guessed." *United States v. Haldeman,* 559 F.2d 31, 62, n. 37 (D.C.Cir.1976) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

Accordingly, this combined factual and legal determination, addressed to the sound discretion of the trial court, will not be disturbed on appeal in the absence of an abuse of discretion. *Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140 (1976); *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974) *appeal dismissed,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974). After a review of the transcript of the voir dire in this case, we discern no record of actual prejudice in the seated jurors which would serve as basis for the substitution of the judgement of this Court for that of the trial court.

In selecting twelve jurors and two alternates, seventy-one potential jurors were individually examined during pre-trial voir dire. Of these seventy-one, fifty-three indicated they knew something about the case, twelve said they knew nothing of the case, and six were not asked whether they had previous knowledge of the case. All jurors who said they had read something about the case in the newspaper and had formed a fixed opinion as to defendant's guilt were excused for cause. Defendant argues that the fact that ten of the fourteen finally chosen had either read in local newspapers or heard on radio or television about the case, establishes the need for grant of a new trial. We need only restate the following oft-quoted portion of *Irvin v. Dowd, supra,* to rebut this assertion.

It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best

qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* 366 U.S. at 722–723, 81 S.Ct. 1639 at 1642, 6 L.Ed.2d at 756.

The trial judge participated in the examination of the jurors, and, to his satisfaction, all who were selected pledged ability to give fair and impartial consideration to the evidence, and none expressed an inability to set aside any impression gained from media coverage. While several potential jurors were dismissed because they indicated an opinion as to defendant's guilt, this by no means suggests a community so immured with sentiment against defendant as to "impeach the indifference of jurors who displayed no animus of their own." *Murphy v. Florida, supra,* 421 U.S. at 803, 95 S.Ct. 2031 at 2037, 44 L.Ed.2d at 596.

Also in *Murphy v. Florida, supra,* the United States Supreme Court referred to a class of cases involving pre-trial publicity in which the coverage is so "inherently prejudicial" that prejudice is presumed.

Prejudice was presumed in the circumstances under which the trials in Rideau, [*Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ], Estes, [*Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) ], and Sheppard [*Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) ] were held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In Rideau the defendant had "confessed" under police interrogation to the murder. . . . A 20-minute film of his confession was broadcast three times by a television sta-

tion in the community.... [rendering] the trial under review "but a hollow formality"—the real trial had occurred when the tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

The trial in Estes had been conducted in a circus atmosphere.... Similarly, Sheppard arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival....

*Murphy v. Florida, supra* at 798–799, 95 S.Ct. 2031 at 2035, 44 L.Ed.2d at 594.

 We recognize that in certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice." *Commonwealth v. Frazier,* 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977). However, "[i]t is trite but true to note that a presumption of prejudice pursuant to this exception requires the presence of *exceptional circumstances." Commonwealth v. Casper, supra,* 481 Pa. at 151, 392 A.2d at 291 (emphasis supplied.) The defendant attempts to bring this case within this latter class of cases by directing attention to the coverage of the trial of his cohort Webber, who pleaded guilty to murder of the second degree on the eve of defendant's trial. The fact of Webber's plea, however, was brought out at defendant's trial when Webber was placed on the stand. Defense counsel, after eliciting Webber's account of the events of February 1, consisting essentially of an account of a partial blackout due to excessive consumption of alcohol, asked Webber:

Q Were you subsequently arrested along with Mr. Bachert for the murder of Thomas Welsh?

A Yes.

Q Have you been tried on that?

A Yes, sir.

Q What was the outcome of that trial?

A I pleaded guilty to murder of the second degree.

Q Why did you plead guilty?

A They told me that ballistics showed that the bullet came from that gun and since it was my gun, I figured I must have killed him.

In the present case, any harm inuring to the defendant by the inclusion of his principal's plea of guilt in pre-trial news coverage is *de minimis* since the same information was presented to the jury at trial. *Cf. Marshall v. United States, supra* (where jurors were exposed through news accounts to information not admissible at trial, conviction was set aside). Furthermore, no claim is made that the publicity surrounding the investigation of the crime and Webber's trial was so extensive, sustained, pervasive or inclusory of highly inflammatory and prejudicial information, as to have created a climate in which a fair trial was impossible. Accordingly, the Superior Court's affirmance of the trial court's denial of application for a change of venue is affirmed.

■ Next, defendant contends that the trial court, in sentencing him on May 26, 1978, failed to comply with *Commonwealth v. Riggins,* 474 Pa. 115, 377 A.2d 140 (1977), which requires that the sentencing judge provide a "statement of reasons" for the sentence imposed.

We have reviewed the record of the sentencing proceeding in this case and find that the judge correctly proceeded in sentencing defendant within statutory limits. The concerns expressed by this Court in *Riggins* are not applicable here. In *Riggins,* there was, of record, a serious misapprehension by the sentencing judge of the sentencing subsection applicable to the defendant; he repeatedly mistated the maximum sentence applicable as fifteen years when it was five years, evidently misreading the Code. Here, no such misapprehension was present; the judge clearly understood the maximum and minimum sentence applicable. Furthermore, in *Riggins,* no presentence report was ordered, although the defendant was in jeopardy of a sentence of total confinement in excess of one year. Here, a presentence report was

ordered, examined by the court in advance of sentencing, offered to the defendant, and reviewed by his counsel for accuracy.

The defendant was invited to, and did in fact, make a statement, exercising his right of allocution. Both defense counsel and the prosecutor made statements, vying for leniency and severity respectively. In compliance with the requirement set forth in *Riggins,* the trial court stated:

[T]he Court would like to state its reasons for the sentencing in these cases. First of all, the court took into consideration the (1) gravity of the offenses; (2) punishment; (3) deterrents [sic]; (4) protection of the public and society; (5) prevention of further crime; (6) rehabilitative need of the defendant.

The brutal, unprovoked slaying of a truly innocent man led the court, after announcing and imposing the jury's recommended sentence of life imprisonment for murder, to sentence the defendant to ten to twenty years imprisonment for kidnapping to run consecutively to the murder sentence, ten to twenty years imprisonment for robbery to run consecutively to the kidnapping sentence, five to ten years imprisonment for criminal conspiracy to run concurrently with the robbery sentence, and three and one-half to seven years imprisonment for theft to run concurrently with the robbery and conspiracy sentences, for a total sentence of imprisonment for life plus twenty to forty years. Defendant was so sentenced, as the judge clearly stated, due to the gravity of the offense, for punishment, deterrence of crime, protection of the public and society, prevention of further crime, and rehabilitation. We do not believe that any additional explanation was necessary for the defendant to understand why he was so sentenced. Order of the Superior Court denying relief is affirmed.

We have also reviewed, but find no merit in, defendant's assertions that trial counsel was ineffective in that he (1) was not adequately prepared for trial; (2) failed to adequately prepare a motion for change of venue; (3) failed to object to allegedly prejudicial prosecutorial remarks; (4)

failed to request that opening and closing remarks be recorded; (5) failed to challenge the qualifications of a firearms examiner who testified as an expert in ballistics; (6) failed to object to the trial court's alleged failure to specifically instruct the jury concerning the limited purpose for which evidence of a prior criminal record is admissible; (7) failed to investigate whether documentation of date of receipt of a certain bank draft, which would have accounted for defendant's possession of cash referred to in testimony at trial, could be acquired to rebut at trial any inference that the cash belonged to the victim.

Defendant further claims that trial counsel "failed to object at crucial points in the testimony, failed to highlight the inconsistent statements of the witnesses, . . . failed to object to illegal evidence used against [him], . . . failed to object to errors made in the jury charge." These claims are dismissed for lack of specificity.

The defendant also appeals from that part of the Superior Court opinion denying relief on defendant's claim of improper restriction of participation of co-counsel. We have reviewed this allegation and determine that it is without merit.

Accordingly, the order of the Superior Court, insofar as it vacates the judgement of sentence as to murder of the first degree and remands for a new trial on the murder indictment, is reversed. The order of the Superior Court affirming the judgements of sentence as to all other charges is affirmed.[2] The denial of relief on defendant's claim of improper restriction of participation by co-counsel is affirmed.

**2.** Defendant challenges, on sufficiency of the evidence grounds, the judgements of sentence as to kidnapping, robbery, theft, and conspiracy. We regard the evidence as recounted, including defendant's admissions, viewed in the light most favorable to the Commonwealth as verdict winner, to be sufficient to sustain convictions of these offenses. Thus, the order of the Superior Court, insofar as it affirms the judgements of sentence as to these convictions, is affirmed.

The order of the Superior Court remanding for appointment of counsel to aid defendant in preparation of his *pro se* allegations of ineffective assistance of counsel is obviated by the appointment of new counsel to pursue this appeal, and subsequent presentation, on this appeal, of claims of ineffectiveness of trial counsel and, therefore, is reversed.

NIX, J., did not participate in the consideration or decision of this case.

ROBERTS, J., files a Concurring Opinion in which O'BRIEN, C.J., joins.

ROBERTS, Justice, concurring.

It is well settled that the use of a gun on a vital part of the deceased's body raises the presumption of a specific intent to kill. See *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248 (1981); *Commonwealth v. Ewing,* 439 Pa. 88, 264 A.2d 661 (1970). Here the Commonwealth's evidence established that the cause of the victim's death was a gunshot wound to the chest inflicted by appellant's accomplice. This evidence, together with the evidence of the actors' shared intent, amply permitted the jury to find appellant guilty of murder of the first degree.

As to the claim of error in refusing to grant appellant's motion for a change of venue, the record of voir dire reveals that, although the community was quite familiar with the killing, the percentage of prospective jurors excused because of a fixed opinion on guilt did not rise to a level indicative of prejudice. Compare *Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066 (1980). Thus the court did not commit reversible error in denying the requested motion.

As the judgment of sentence of murder of the first degree was properly imposed, I concur in the reinstatement of that judgment.

O'BRIEN, C.J., joins in this concurring opinion.