## Commonwealth v. McEneaney

450

*William R. Toal,* for the Commonwealth.
*Patrick J. Connors,* for defendant McEneaney.
*Robert Datner,* for defendant Mark.

JENKINS, *J.,* December 27, 2007—On March 24, 2006, Christopher McEneaney, at the time less than 18 years of age, and Andre Mark brutally beat a homeless man to death for the perverse thrill of taking an innocent person's life. The court recommends that McEneaney's judgment of sentence for first-degree murder and Mark's judgment of sentence for third-degree murder be affirmed.

## I. PROCEDURAL HISTORY

On November 1, 2006, the court held a hearing on McEneaney's petition to transfer his case to juvenile court. At the conclusion of the hearing, the court ruled from the bench that McEneaney should stand trial as an adult.

Trial commenced on March 20, 2007. On March 23, 2007, the jury found McEneaney guilty of first-degree murder and Mark guilty of third-degree murder. On May 29, 2007, the court sentenced McEneaney to life imprisonment and Mark to 20-40 years imprisonment for third-degree murder.

On June 5, 2007, McEneaney filed a timely notice of appeal. On June 5, 2007, the court ordered McEneaney

to file a concise statement of matters complained of on appeal within seven days. Subsequently, the court granted McEneaney an extension until July 8, 2007 within which to file his concise statement. McEneaney timely filed his concise statement on July 2, 2007.

Meanwhile, on June 8, 2007, Mark filed timely post-sentence motions. On June 25, 2007, the court denied Mark's post-sentence motions, prompting him to file a timely notice of appeal on July 25, 2007. On August 2, 2007, the court signed a scheduling order directing Mark to file his concise statement within 21 days. The docket reflects that on August 8, 2007, the Office of Judicial Support (OJS) served the scheduling order on Mark's counsel. Thus, the deadline for Mark's concise statement was August 29, 2007. Mark's counsel did not file the concise statement until September 11, 2007, 13 days late.

On September 12, 2007, the court wrote to counsel for Mark that the second issue in his concise statement alleging "improper remarks" by the prosecutor was indecipherable because counsel failed to specify the remarks in question. On September 17, 2007, Mark's counsel filed an amended concise statement that identified the allegedly inappropriate remarks, viz., the prosecutor's reference in his opening statement that Mark and McEneaney stalked the victim "like hunters . . . stalking their prey."

## II. FACTUAL HISTORY

At 8 p.m. on March 24, 2006, a Friday evening, several teenagers observed Martin Malone, a homeless man, carrying a shovel through a parking lot in Upper Darby

near a Modell's store and St. Eugene's Field. N.T., 3/21/07, pp. 6, 9, 11, 45-46, 60, 84. The teenagers then witnessed Mark and McEneaney walking after Malone while taunting him and yelling insults and curses. N.T., 3/21/07, pp. 9-12, 64, 86. Mark and McEneaney then threw rocks at Malone that they procured from a construction site in the parking lot. N.T., 3/21/07, pp. 17-19, 50, 85, 90. Malone hid behind a nearby dumpster to avoid being hit by the rocks. N.T., 3/21/07, pp. 12-14, 89. The teenagers noticed that McEneaney had a shiny object in his hand. N.T., 3/21/07, pp. 65, 88-89. The object was a knife. N.T., 3/21/07, pp. 88-89.

As the teenage witnesses drove away, the two assailants began running after Malone. N.T., 3/21/07, p. 67. McEneaney motioned with the knife, taunting Malone with it. N.T., 3/21/07, pp. 106-107. Mark and McEneaney yelled at Malone to put down the shovel and fight. N.T., 3/21/07, p. 113.

After driving a few blocks away, the teenagers returned to the Bishop Hill Apartments and saw Malone lying on a field. N.T., 3/21/07, pp. 17, 69. The boys called the police. N.T., 3/21/07, p. 69. Malone had shovel marks on his face and was bleeding and badly injured. N.T., 3/21/07, pp. 141-43. Malone died from injuries suffered in the attack. The medical examiner concluded that the manner of death was homicide caused by multiple stab wounds. N.T., 3/22/07, pp. 125-36.

On March 26, 2006, Mark admitted to Upper Darby police that he and "another guy" (McEneaney) threatened Malone after they saw him "going through" a dumpster. Exhibit C-40, p. 1. The confrontation began with words and escalated to rock throwing after Malone "mooned"

Mark and the other person. Exhibit C-40, p. 3. Mark claimed that Malone swung a shovel at him, but that he and the "other person" quickly got the upper hand. Mark admitted punching Malone in the jaw, "and we just beat the guy." Exhibit C-40, p. 1. Mark claimed that McEneaney struck Malone with the shovel. Exhibit C-40, p. 1.

McEneaney also gave a statement to police in which he admitted yelling at Malone and throwing rocks at him with Mark. Exhibit C-39, p. 1. McEneaney claimed that he stabbed Malone only after Malone hit him with the shovel. Exhibit C-39, pp. 1-2. McEneaney also admitted hitting Malone on the head with a shovel. Exhibit C-39, p. 2.

## III. ALL OF MARK'S ARGUMENTS ON APPEAL ARE WAIVED DUE TO MARK'S UNTIMELY FILING OF HIS CONCISE STATEMENT OF MATTERS COMPLAINED OF ON APPEAL; MOREOVER, NONE OF HIS ARGUMENTS HAVE MERIT

### A. *Mark's Arguments Are Waived Under Pa.R.A.P. 1925*

Under the old version of Pa.R.A.P. 1925, an appellant's failure to file a timely concise statement resulted in waiver of all issues raised in the untimely statement. *Commonwealth v. Schofield,* 585 Pa. 389, 888 A.2d 771 (2005). Is the same penalty required under the new version of Rule 1925, which became effective several weeks before Mark's appeal? The court finds that it is.

The old version of Rule 1925(b) provided:

"The lower court forthwith may enter an order directing the appellant to file of record in the lower court and

serve on the trial judge a concise statement of the matters complained of on the appeal no later than 14 days after entry of such order. A failure to comply with such direction may be considered by the appellate court as a waiver of all objections to the order, ruling or other matter complained of."

The new version of Rule 1925(b) became effective on July 9, 2007, 18 days before Mark's appeal. It prescribes in relevant part:

"If the judge entering the order giving rise to the notice of appeal (judge) desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal. . . .

"*(2) Time for filing and service.—The judge shall allow the appellant at least 21 days from the date of the order's entry on the docket for the filing and service of the statement. Upon application of the appellant and for good cause shown, the judge may enlarge the time period initially specified or permit an amended or supplemental statement to be filed. In extraordinary circumstances, the judge may allow for the filing of a statement or amended or supplemental statement nunc pro tunc.*

*(3) Contents of order.*—The judge's order directing the filing and service of a statement shall specify:

"(i) the number of days after the date of entry of the judge's order within which the appellant must file and serve the statement;

"(ii) that the statement shall be filed of record;

"(iii) that the statement shall be served on the judge pursuant to paragraph (b)(1);

"(iv) that any issue not properly included in the statement timely filed and served pursuant to subdivision (b) shall be deemed waived." (emphasis added)

Although new Rule 1925(b) is not as explicit with regard to untimely concise statements as old Rule 1925(b), new Rule 1925(b)(2) makes clear that an appellant's failure to file a timely concise statement constitutes a waiver of all issues raised in the untimely statement. The last two sentences of Rule 1925(b)(2) state that (1) the deadline for filing concise statements can only be extended upon application of the appellant and for good cause, and (2) if the appellant fails to apply for an extension before the deadline, he cannot file a late petition unless he can demonstrate "extraordinary circumstances." By including these provisions, the Supreme Court signaled its intent that Pennsylvania courts strictly enforce the time limitations in the new rule.

Mark's concise statement clearly is untimely under new Rule 1925(b). In compliance with Rule 1925(b)(3), the court's scheduling order specifies the number of days that Mark had to file a concise statement (21), directs him to file the concise statement of record and to serve a copy on the judge, and warns him that all issues not included in the concise statement will be waived. Moreover, the docket establishes that OJS served the scheduling order on Mark's counsel via first-class mail on August 8, 2007, thereby eliminating any doubt that the deadline for filing the concise statement was August 29, 2007.[1]

---

1. OJS's diligence in listing the time and method of service is critical to the resolution of the timeliness issue. Had OJS failed to include this information on the docket, there would have been no way to identify the deadline for filing the concise statement. See *Common-*

Given these facts, Mark's counsel waived all of Mark's arguments on appeal by failing to file the concise statement until September 11, 2007 and neglecting to demonstrate "extraordinary circumstances" for the untimely filing.

### B. *Assuming* Arguendo *That Mark Did Not Waive All Issues on Appeal, the Evidence Was Sufficient To Support Mark's Conviction for Third-Degree Murder As an Accomplice to McEneaney*

Mark contends that the evidence did not support his conviction for third-degree murder under a theory of accomplice liability. The court disagrees.

When reviewing a challenge to the sufficiency of the evidence, Pennsylvania appellate courts must view all the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, the verdict winner. *Commonwealth v. Widmer,* 560 Pa. 308, 319, 744 A.2d 745, 751 (2000). The evidence is sufficient to support the verdict when it establishes each material element of the crime charged against the defendant beyond a reasonable doubt. *Id.*

### 1. Standards Defining Accomplice Liability for Third-Degree Murder

Third-degree murder constitutes all forms of homicide other than (a) an intentional killing or (b) a killing committed while defendant was engaged as a principal or an

---

wealth v. Hess, 570 Pa. 610, 617-18, 810 A.2d 1249, 1254 (2002) (concise statement held not untimely because, inter alia, docket did not state the time and method of service of the Rule 1925 order).

accomplice in the perpetration of a felony. 18 Pa.C.S. §2502(c). A person may be convicted of third-degree murder "where the murder is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice aforethought. Malice consists of a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.'" *Commonwealth v. Gooding,* 818 A.2d 546, 550 (Pa. Super. 2003) (citing *Commonwealth v. Pigg,* 391 Pa. Super. 418, 425, 571 A.2d 438, 441 (1990)). Further, "malice may be inferred from the use of a deadly weapon on a vital part of the victim's body." *Id.* (citing *Commonwealth v. Gonzales,* 415 Pa. Super. 564, 568, 609 A.2d 1368, 1369 (1992)).

A conviction for third-degree murder can rest upon a theory of accomplice liability. *Id.;* see also, *Commonwealth v. Flanagan,* 578 Pa. 587, 601, 854 A.2d 489, 501 (2004); *Commonwealth v. Kimbrough,* 872 A.2d 1244, 1251-55 (Pa. Super. 2005). The Crimes Code defines accomplice liability as follows:

"*(a) General rule*—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

"*(b) Conduct of another*—A person is legally accountable for the conduct of another when: . . .

"(3) he is an accomplice of such other person in the commission of the offense.

"*(c) Accomplice defined*—A person is an accomplice of another person in the commission of an offense if:

"(1) with intent of promoting or facilitating the commission of the offense, he:

"(i) solicits such other person to commit it; or

"(ii) aids or agrees or attempts to aid such other person in planning or committing it.

"*(d) Culpability of accomplice*—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense." 18 Pa.C.S. §306.

Our Supreme Court has provided the following succinct explanation of accomplice liability under section 306:

"It is well-established . . . that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor . . . [T]wo prongs must be satisfied for a defendant to be found guilty as an 'accomplice.' See *Commonwealth v. Woodward,* 418 Pa. Super. 218, 614 A.2d 239, 242 (1992). *First, there must be evidence that the defendant intended to aid or promote the underlying offense.* See *id. Second, there must be evidence that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal.* See *id.* While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. See *Commonwealth v. Wagaman,* 426 Pa. Super. 396, 407, 627 A.2d 735, 740 (1993). There must be some additional

evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. See *id.* With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime. See *Commonwealth v. Cox,* 546 Pa. 515, 529, 686 A.2d 1279, 1286 (1997)." *Commonwealth v. Murphy,* 577 Pa. 275, 286, 844 A.2d 1228, 1234 (2004) (emphasis added); see also, *Commonwealth v. Coccioletti,* 493 Pa. 103, 109, 425 A.2d 387, 390 (1981) (only the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice); *Commonwealth v. Graves,* 316 Pa. Super. 484, 489, 463 A.2d 467, 470 (1983) (no agreement is required, only aid).

Several other important points bear mention. Under section 306(c), "to promote" an offense means "to contribute to [its] progress or growth." *Commonwealth v. Kimbrough,* 872 A.2d 1244, 1252 (Pa. Super. 2005), *appeal denied,* 585 Pa. 687, 887 A.2d 1240 (2005), *denial of post-conviction relief affirmed in part, vacated in part,* 938 A.2d 447 (Pa. Super. 2007) (citing Webster's II New College Dictionary 885 (1995)). Under the same subsection, "to facilitate" an offense means "to make the commission of a crime easier" or to make it easier for another person to commit a crime. *Id.* (citing Black's Law Dictionary 610 (7th ed. 1999)).

Significantly, "to determine the kind of homicide of which the accomplice is guilty, it is necessary to look to *his* state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one which the accomplice harbored and cannot depend upon proof of

intent to kill only in the principal." *Commonwealth v. Bachert,* 499 Pa. 398, 406, 453 A.2d 931, 935 (1982). Consequently, the state of mind of the accomplice "*may [be] different from the state of mind of the principal and they thus may be guilty of different offenses.* Thus, because first-degree murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation. And, because a killing in a heat of passion is manslaughter and not murder, an accomplice who aids while in such a state is guilty only of manslaughter even though the killer is himself guilty of murder. Likewise, it is equally possible that the killer is guilty only of manslaughter because of his heat of passion but that the accomplice, aiding in a state of cool blood, is guilty of murder." LaFave, 2 Substantive Criminal Law, §13.2(c). (footnotes omitted) (emphasis added)

Thus, as in this case, an accomplice can be convicted for third-degree murder even though the principal is convicted of first-degree murder. This has occurred in at least two reported decisions. *Kimbrough, supra* (principal convicted of first-degree murder while accomplice was convicted of third-degree murder; evidence was sufficient to show that defendant aided principal in acquisition of gun and set stage for shooting, so as to support defendant's conviction for third-degree murder as an accomplice, where defendant had argument with one victim in bar, told co-defendant to take principal to apartment to retrieve loaded gun, obtained gun from principal, brandished gun, threatened bar patrons, and told victim's brother that he was going to kill him, and defendant, when he left bar, held cocked gun on his person in such position that it was taken easily and without incident by

principal, who then commenced shooting);[2] *Commonwealth v. Gooding,* 818 A.2d 546 (Pa. Super. 2003) (evidence was sufficient to support conviction of defendant as accomplice to third-degree murder; defendant kidnapped victim along with principal and other men, defendant drove lead car to site of murder, while second car, carrying victim, followed defendant's car, principal shot victim at murder site and left site in defendant's car, and defendant told principal that they should not tell anyone about shooting).[3]

## 2. Discussion

Construed in the light most favorable to the Commonwealth, the evidence clearly supports Mark's third-degree murder conviction on a theory of accomplice liability.

With regard to the first prong of accomplice liability, the evidence shows that Mark intended to facilitate Malone's murder. Acting in tandem with McEneaney, Mark took part in each stage of the deadly attack, first by taunting and jeering Malone, then throwing rocks at him, then running after him and cornering him on the field, then punching Malone repeatedly while McEneaney smashed Malone's head with a shovel and stabbed him to death. Mark was not merely present at the scene of the crime;

---

2. Although the Superior Court ordered further PCRA proceedings in this case on December 3, 2007, the remaining issues do not concern the sufficiency of the evidence underlying Kimbrough's third-degree murder conviction.

3. The principal was convicted of first-degree murder and sentenced to death. The Supreme Court upheld his judgment of sentence on direct appeal. See *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767 (2004) (affirming judgment of sentence).

nor did he merely have knowledge about the crime. His own vicious conduct made it possible for McEneaney to administer the brutal and wicked *coup de grace.*

The same evidence satisfies the second prong of accomplice liability. Mark actively participated in the attack by aiding the principal, McEneaney, in murdering Malone. The evidence refutes Mark's attempt to downplay his conduct and shift the blame entirely upon McEneaney's shoulders.

Finally, Mark's conduct epitomizes the "wickedness of disposition, hardness of heart, [and] cruelty" characteristic of malice, the requisite state of mind for third-degree murder. His acts of senseless violence are at least as wrongful as other acts deemed malicious by our appellate courts. Compare, *e.g., Commonwealth v. Pigg,* 391 Pa. Super. 418, 425, 571 A.2d 438, 441 (1990) (defendant's conduct held malicious where he killed two people in head-on collision between his tractor-trailer and their vehicle on narrow road while he was intoxicated and after he ignored another driver's request to stop driving).

Given the ample evidence that Mark acted with malice, the jury properly convicted Mark of third-degree murder despite also finding McEneaney guilty of first-degree murder. Bachert and LaFave's treatise on criminal law make clear that an accomplice (Mark) may have a different state of mind than the principal (McEneaney), thereby making him guilty of a different offense.

## C. *Mark Waived His Claim of Prosecutorial Misconduct by Failing To Raise a Timely Objection During the Commonwealth's Opening Statement; in any Event, the Claim of Misconduct Is Devoid of Merit*

During his opening statement, the prosecutor stated: "McEneaney and Mark stalked Marty Malone on that evening like two hunters that were stalking their prey." Although Mark did not object to this remark during trial, he now contends that this comment constituted prosecutorial misconduct which entitles him to a new trial.

Mark has waived this issue due to his failure to raise an objection at the time of the alleged misconduct and move for a mistrial. *Commonwealth v. Sasse,* 921 A.2d 1229, 1238 (Pa. Super. 2007) (citing *Commonwealth v. Jones,* 501 Pa. 162, 460 A.2d 739 (1983)) (claim of prosecutorial misconduct waived due to defendant's failure to make contemporaneous objection and move for mistrial); *Commonwealth v. Andrulewicz,* 911 A.2d 162, 167-68 (Pa. Super. 2006) (defendant waived claim that Commonwealth counsel committed prosecutorial misconduct in closing argument of sexual assault trial by continuously vouching for credibility and veracity of Commonwealth's witnesses, where defendant failed to object to alleged improper statements); *Commonwealth v. Hassine,* 340 Pa. Super. 318, 490 A.2d 438 (1985) (noting that the absence of an objection to alleged prejudicial remarks made during a prosecutorial summation renders the issue waived).

Moreover, the court agrees with the Commonwealth that the prosecutor's statement was within the boundaries of oratorical flair. Our appellate courts have ruled that

similar statements comparing criminals to hunters and victims as prey are permissible. *Commonwealth v. Miller,* 897 A.2d 1281, 1291 (Pa. Super. 2006) (Commonwealth's opening and closing statements concerning use of noun "predator" and verb "preys" to describe defendant did not warrant new trial; defendant asked her victim for money and when refused, came back with hammer and knife and bludgeoned and stabbed her to death, slitting her throat, and in the days that followed, she returned to victim's apartment and stole checks, credit cards, and victim's car, each time walking past victim's corpse sitting at kitchen table, such that defendant's actions could reasonably be termed predatory); *Commonwealth v. Miles,* 545 Pa. 500, 511, 681 A.2d 1295, 1300 (1996), *cert. denied,* 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997) (concluding prosecutor's comparison of defendant's actions to the hunting style of "animals of prey" was not improper); *Commonwealth v. Van Horn,* 797 A.2d 983 (Pa. Super. 2002) (holding prosecutor's characterization of victim as prey was within the limits of proper oratorical flair). Based on the evidence described above, the hunter-prey simile is as applicable here as it was in *Miller, Miles* and *Van Horn.*

### D. *Mark's Sentence of 20-40 Years Imprisonment Was Proper*

The Commonwealth argues that Mark's counsel waived this issue by failing to object to the discretionary aspects of his sentence during his sentencing hearing or in post-sentence motions. The court concludes that Mark's counsel raised this issue during sentencing by requesting a mitigated range sentence. N.T., 5/29/07, pp. 23-28.

The court, however, finds that Mark's sentence was appropriate. Mark has a prior record score of 5, and his offense gravity score is 14. The sentence of 20-40 years imprisonment is within the standard range for this combination of factors. Moreover, this sentence is appropriate in light of his heinous crime and the pre-sentence investigation report's conclusion of his inability to adjust to society's requirements despite multiple juvenile rehabilitation programs. N.T., 5/29/07, pp. 28-30. (Court's reasons for Mark's sentence.)

## IV. McENEANEY'S ARGUMENT ON APPEAL IS DEVOID OF SUBSTANCE BECAUSE THE COURT PROPERLY DIRECTED McENEANEY'S CASE TO PROCEED IN ADULT CRIMINAL COURT

McEneaney contends that he proved by a preponderance of the evidence that the charges against him should be transferred to juvenile court, and that the court denied his motion to transfer because it failed to consider the transfer criteria in the Juvenile Act, 42 Pa.C.S. §6301 et seq. The court concludes that McEneaney failed to meet his burden of proof, and that it properly considered the criteria in the Juvenile Act when denying his petition.

### A. *Standard of Review*

When an individual under 18 years of age is charged with murder, criminal courts usually must adjudicate the matter instead of juvenile court. The Juvenile Act requires juvenile courts to handle "proceedings in which a child is alleged to be delinquent. . . ." 42 Pa.C.S. §6303(a)(1).

The Act, however, expressly excludes murder from the definition of "delinquent act." 42 Pa.C.S. §6302.

The only time that the criminal court can transfer a homicide case to juvenile court is when the child demonstrates by a preponderance of the evidence that transfer to juvenile court will "serve the public interest." 42 Pa.C.S. §6322(a). To determine whether transfer will serve the public interest, "the [criminal division] shall consider the factors contained in [42 Pa.C.S. §]6355(a)(4)(iii) (relating to transfer to criminal proceedings)."

Section 6355(a)(4)(iii) requires the criminal division to consider the following factors when deciding whether to transfer:

"(A) the impact of the offense on the victim or victims;

"(B) the impact of the offense on the community;

"(C) the threat to the safety of the public or any individual posed by the child;

"(D) the nature and circumstances of the offense allegedly committed by the child;

"(E) the degree of the child's culpability;

"(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

"(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

"(I) age;

"(II) mental capacity;

"(III) maturity;

"(IV) the degree of criminal sophistication exhibited by the child;

"(V) previous records, if any;

"(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

"(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

"(VIII) probation or institutional reports, if any;

"(IX) any other relevant factors."

Juveniles bear the burden of proving that transfer to the juvenile court is appropriate due to the legislative presumption that the criminal division is the proper forum for murder charges. *Commonwealth v. Ramos,* 920 A.2d 1253, 1258 (Pa. Super. 2007). To hold otherwise " 'would create the anomalous situation whereby the party in whose favor a legislative presumption has been created [the Commonwealth] is called upon to offer the evidence to support the presumption. Such a concept would be at variance with the well established principle of the law of evidence that a presumption shifts not only the burden of proof, but also shifts the burden of coming forward with the evidence to establish the fact in issue.' *Commonwealth v. Greiner,* 479 Pa. 364, 370, 388 A.2d 698, 701-702 (1978) (holding that the burden of proof rests on the Commonwealth when it seeks to transfer an accused from juvenile court to criminal court). 'The legislative determination to exclude [specified offenses] from the jurisdiction of the juvenile courts evidenced an assumption that the criminal justice system was the proper forum for the resolution of such matters unless

the party seeking the juvenile court as a forum could establish reasons to the contrary.' *Id.*" *Ramos, supra,* 920 A.2d at 1258-59.

"Decisions of whether to grant decertification will not be overturned absent a gross abuse of discretion. An abuse of discretion is not merely an error of judgment but involves the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment passed upon partiality, prejudice or ill will." *Id.* at 1257 (citing *Commonwealth v. Sanders,* 814 A.2d 1248, 1250 (Pa. Super. 2003)).[4]

### B. *Evidence Presented During the Decertification Hearing*

The court carefully considered the testimony of Dr. Jerry Lazaroff, McEneaney's expert witness in the field of adolescent and child psychology with an emphasis in the juvenile justice system. Competency hearing transcript (CHT), 11/1/06, pp. 9-52. Ultimately, the court

---

4. In practice, our appellate courts are extremely reluctant to overturn a trial court's refusal to transfer a case to juvenile court. Earlier this year, the Superior Court affirmed a decision not to transfer a case to juvenile court even though the juvenile was only 14 years old. See *Commonwealth v. Saez,* 925 A.2d 776, 779-81 (Pa. Super. 2007) (juvenile court acted within its discretion in certifying 14-year-old juvenile to stand trial as an adult on charges of attempted murder, aggravated assault, terroristic threats, and other offenses, even though probation officer believed that juvenile was amenable to treatment in juvenile system; probation officer did not consider impact of offenses on victim and was unaware of details of offenses, juvenile court considered juvenile's background and concluded that no alternative treatment facilities would be sufficient, and facts present in case included juvenile's use of a gun, lack of empathy for victim, and accumulation of 104 unexcused absences from school during prior year).

found the testimony of the Commonwealth's expert, William Russell, and its other witnesses far more convincing than Dr. Lazaroff's testimony.

Dr. Lazaroff evaluated whether McEneaney was at risk for committing further aggressive acts or whether he was amenable to rehabilitation through the juvenile justice system. CHT, p. 10.

Dr. Lazaroff learned that McEneaney's father worked as a roofer but fell from a roof and became partially paralyzed when McEneaney was 7. CHT, p. 11. Several years later, McEneaney's father got into an automobile accident, which McEneaney witnessed, and both of his legs had to be amputated. CHT, p. 11. McEneaney's father then began to abuse Oxycontin and heroin heavily. CHT, p. 11. McEneaney's mother also abused Oxycontin, heroin, and alcohol and would often leave the house for several days, leaving McEneaney and his sisters to tend to his bedridden father. CHT, p. 11. His mother has been in rehabilitation several times and has also been incarcerated. CHT, p. 12. McEneaney's father became sicker and died when McEneaney was 14. CHT, p. 11.

McEneaney's educational record was also troubled. His IQ is 81, a score at the lower end of the low average range. CHT, p. 15. In the ninth grade, he was only performing at a fourth grade level, and he was constantly disrupting classes, getting into fights, and had incidents of insubordination, property destruction, insulting language and verbal or physical aggression. CHT, pp. 13-14, 35. He also seriously injured a peer on a school bus. CHT, p. 35.

McEneaney attended public school until September 2005, when he was transferred to the Wordsworth Acad-

emy, a special education school for children with emotional and behavioral difficulties. CHT, p. 13. After transferring to Wordsworth, however, he "was beginning to turn around his school situation" with good grades, perfect attendance and personable conduct toward staff and peers. CHT, p. 15; see also, CHT, pp. 24 (McEneaney was "excelling" at Wordsworth), 49 (McEneaney's grades at Wordsworth). He also liked the counselor that he was seeing at Wordsworth and felt that she was helping him. CHT, p. 22.

McEneaney admitted to Dr. Lazaroff that he began smoking marijuana at age 13 and continued to smoke marijuana twice per month. CHT, p. 20. He claimed, however, that he was not high on the night of the incident. CHT, p. 20.

Dr. Lazaroff interviewed McEneaney in prison on June 16, 2006, less than two months after the attack. CHT, p. 16. McEneaney claimed that he and Mark were forced to defend themselves against Malone while they were walking home from McDonald's. McEneaney claimed that he and Mark saw Malone rummaging through a dumpster and taunted him by saying "get out of the trash, you bum." CHT, p. 17. Malone became angry, called Mark a "nigger," and pulled down his pants and told Mark to "kiss his white ass." CHT, p. 17. Mark and McEneaney continued to taunt Malone, who looked like he was "high on something because he couldn't even stand up straight." CHT, p. 17. Malone, McEneaney continued, obtained a shovel from his truck and approached McEneaney, who threw a rock that hit Malone in the chest. CHT, p. 18. Mark and McEneaney began to walk home, but Malone followed them until Mark and

McEneaney stopped and asked Malone what he wanted. CHT, p. 18. Malone then knocked McEneaney down with the shovel and attempted repeatedly to hit McEneaney on the ground until Mark punched him in the face. CHT, p. 18. McEneaney stood up, removed a Swiss Army style knife from his pocket, and held it in front of him hoping that Malone would leave when he saw it. CHT, p. 18. Malone, however, "came toward [McEneaney] and [the knife] went into his chest." CHT, p. 18. Malone continued to fight, but as McEneaney tried to tackle him, Mark stabbed him in the side. CHT, p. 19. Malone fell to the ground but kept trying to hit McEneaney with the shovel. CHT, p. 19. Mark tried to grab the shovel, but Malone would not let go, so McEneaney "poked" Malone "in the side again with the knife." CHT, p. 19. Malone let go of the shovel, and McEneaney hit Malone twice with the shovel and threw it away. CHT, p. 19. Mark then picked up the shovel and hit Malone with the shovel. CHT, p. 19. Mark threw the shovel in the bushes, and he and McEneaney walked home. CHT, p. 19.

Notably, Dr. Lazaroff admitted that McEneaney did not mention in his statement to police that Malone came after him and Mark. CHT, p. 39. Dr. Lazaroff further admitted that McEneaney might have minimized the number of times he stabbed Malone during his interview. CHT, p. 40.

According to Dr. Lazaroff, McEneaney "was very apologetic and remorseful about what had happened" and said that "I can't believe I did something like that; I'm really sorry that I killed somebody." CHT, p. 16. McEneaney "realize[d] that he used exceedingly poor

judgment during this incident and wishes he would have had the foresight to simply walk away before the altercation turned violent." CHT, p. 23.

Dr. Lazaroff administered the Carlson Psychological Inventory, a procedure given to people charged with crimes and involved in correctional systems. CHT, p. 21. In his opinion, McEneaney did not appear seriously emotionally disturbed, but he will often display poor judgment and act impulsively. CHT, p. 21. Nevertheless, he did not appear to be aggressive or predatory, CHT, pp. 23-24, and he admitted that he needed counseling to bring his temper under control. CHT, p. 25. Moreover, he did not have any prior contacts with the juvenile or criminal justice system. CHT, p. 25. Accordingly, Dr. Lazaroff believed that he would do well in a juvenile court setting; that with counseling and education, he would eventually assume a productive role in society; and that juvenile systems provided more appropriate means of rehabilitation than the adult criminal system. CHT, p. 26. Dr. Lazaroff opined: "He is still 16 1/2 years of age.[5] He has until the age of 21. And I believe that's sufficient time for him to be rehabilitated and receive the services he needs." CHT, p. 26.

On cross-examination, Dr. Lazaroff admitted that McEneaney had suicidal thoughts and had cut his wrists prior to the altercation with Malone. CHT, p. 46. Moreover, McEneaney did not mention his suicidal thoughts during his interview with Dr. Lazaroff. CHT, p. 46. Dr. Lazaroff only learned about them later while interviewing McEneaney's sister. CHT, p. 46.

---

5. On cross-examination, Dr. Lazaroff admitted that McEneaney is now 17. CHT, p. 44.

The Commonwealth's forensic psychologist, William Russell, testified that he performed an evaluation on McEneaney on September 12, 2006. Russell observed that while McEneaney was in middle school, he had a lengthy history of anger problems, oppositional defiant behavior and aggressive behavior. CHT, p. 55. These problems did not disappear when he moved from his parents into his aunt's home, because he rebelled against her more structured environment. CHT, p. 57. Russell found it "naive" to think that his problems would resolve simply by placing him in a special educational environment such as Wordsworth or a juvenile facility. CHT, pp. 57-58. Indeed, the fact that only two weeks passed between his suicide attempt and the attack on Malone demonstrates that his violent tendencies did not "magically disappear[]" when he transferred to Wordsworth. CHT, p. 66.

Russell testified that McEneaney gave an honest account of the attack on Malone until he described the stabbing. CHT, pp. 59-60. Russell found credible McEneaney's admission that he and Mark were harassing Malone, but Russell did not believe McEneaney's claim that he only stabbed Malone twice or that Malone escalated the incident by picking up a shovel. CHT, pp. 59-60. McEneaney did not cry or show sadness while recounting these events, and his presentation was generally flat throughout the interview. CHT, pp. 60-61.

Russell concluded that McEneaney was not amenable to juvenile court treatment, because he could not be rehabilitated between his present age (17) until he was 21. CHT, pp. 61-63. McEneaney's offense had a "tremendous impact on both the victim and the victim's

family." CHT, p. 61. McEneaney posed a serious threat to the community without appropriate controls, given the violence of his attack (multiple stab wounds) and the fact that he could have broken off the attack at any number of points during the incident. CHT, pp. 61-62. Moreover, McEneaney has had a "lengthy period of developmental disturbance . . . if we look at the early exposure to violence, with difficulty in functioning with rules, the academic problems, the school behavior problems, the limited social interactivity, [and his] only friends [being] delinquents . . . When you put all these together, we have a very serious problem to address." CHT, p. 62. A youth development center would not address these problems, because they do not have intensive treatment, and McEneaney needed a much longer period than four years to develop the controls that he needed to function in the community. CHT, pp. 62-63.

Peter Pitts, a Delaware County probation officer, corroborated Russell's negative opinion about McEneaney even though McEneaney's attorney called him as a witness. Pitts testified that he did not interview McEneaney because he "felt in looking at the affidavit [of probable cause] and what the juvenile admitted to doing . . . he was not [an] appropriate juvenile to . . . come back to juvenile court. Even looking at the best case scenario and being impressed in the interview . . . the charges are so serious that that kind of case is not brought back to juvenile court." CHT, p. 80.

Lastly, Isabelle Malone, Malone's oldest sister, testified that his death has caused considerable grief to her entire family. CHT, pp. 93-97.

## C. *Analysis*

Based on this evidence, the court correctly concluded that this case belongs in adult criminal court, since none of the criteria within 42 Pa.C.S. §6355(a)(4)(iii) weigh in McEneaney's favor.

The court will examine each factor seriatim:

*Impact on the victim's family.* Isabella Malone's testimony demonstrates that Malone's death caused his family to suffer extreme grief.

*Impact on the community.* This incident involved the tragic and senseless death of a member of Upper Darby's community. Crimes of violence, particularly crimes that cause death, wound the fabric of the community more than any other offense.

*Threat to the safety of the public or any individual posed by the child.* The court credited the testimony of the Commonwealth's forensic psychologist, William Russell, that McEneaney poses a serious threat to the public. McEneaney participated in the brutal assault that cost Malone his life. He has shown serious developmental issues and a marked propensity for aggressiveness throughout his middle school years and during his stay at Wordsworth Academy. Moreover, he has exhibited suicidal tendencies.

*Nature and circumstances of the offense allegedly committed by the child.* The prosecutor aptly described McEneaney's offense as "brutal and depraved . . .

"[McEneaney] took the shovel from Mr. Malone, who . . . was protecting himself from these two individuals who had chased him into a field. He beats him over the

head with a shovel . . . [T]here was extreme bruising from the shovel on the victim's head. And then he was stabbed eight times. He was stabbed three times in the buttocks. He was stabbed three times in the upper back. He was stabbed in the front of his body, once in the chest and a long slash wound that was so deep from this knife . . . [that] it went four inches into his body and cut his heart, causing him to die."

This factor, perhaps more than any other, made this case inappropriate for juvenile court.

*Degree of the child's culpability.* The evidence presented at the decertification hearing (and at trial) demonstrates that McEneaney was an enthusiastic participant—indeed, the principal participant—in a dreadful crime.

*Adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system.* The juvenile court system is not an adequate alternative in these circumstances. The court agrees with Russell's opinion that it is "naive" to think that McEneaney's problems would evaporate simply by placing him in a special educational environment such as Wordsworth or a juvenile facility. Moreover, as Russell stated, McEneaney needs a much longer period than four and a half years (the maximum time that McEneaney could spend in the juvenile system) to develop the controls that he needed to function in the community.

*Whether the child is amenable to treatment, supervision or rehabilitation as a juvenile.* Upon review of the criteria in section 6355(a)(4)(iii)(G), the court finds that McEneaney is not amenable to treatment, supervision or rehabilitation as a juvenile. The court acknowledges that

a major cause of McEneaney's troubles is his chaotic and unstructured upbringing. His father, who died several years ago, was an invalid due to a work-related accident, and was also a drug abuser. His mother abused Oxycontin, heroin, and alcohol and frequently left the house for days at a time, leaving McEneaney and his sister to fend for themselves. It is not surprising that the absence of parental guidance has led McEneaney into dire straits.

Nevertheless, as discussed above, there is too little time for him to develop the controls in the juvenile system that he needs to function as a responsible citizen in the community. His tendencies towards impulsive behavior, anger, aggression and suicide make him a very poor candidate for juvenile court treatment. Lastly, the horrific nature of his offense makes juvenile court an inappropriate setting for this case.

To summarize, McEneaney has failed to prove by a preponderance of the evidence that he is suitable for juvenile rehabilitation. The factors listed within section 6355(a)(4)(iii) overwhelmingly mandate that this case belongs in adult criminal court.

For all of the foregoing reasons, the court respectfully recommends that Mark's and McEneaney's judgments of sentence be affirmed.