J-S59013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PERRY SAM RICCIARDI, II, | |
| Appellant | No. 1914 WDA 2014 |

Appeal from the PCRA Order November 10, 2014
In the Court of Common Pleas of Lawrence County
Criminal Division at No(s): CP-37-CR-0001290-2000

BEFORE:  BOWES, DONOHUE, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                     **FILED DECEMBER 18, 2015**

Perry Sam Ricciardi, II, appeals from the order entered November 10, 2014, denying his first counseled PCRA petition filed pursuant to 42 Pa.C.S. §§ 9541-9546.[1]  After careful review, we affirm.

This Court previously delineated the factual and procedural background of this matter as follows.

> On October 8, 2000, S.K. disappeared after leaving her Youngstown, Ohio, residence. Three days later, her body was discovered under a culvert near an access road in Mahoning Township, Lawrence County, Pennsylvania.    Investigators

_____

[1]  Appellant previously filed a PCRA petition that successfully reinstated his direct appeal rights.  A subsequent petition filed after the reinstatement of a defendant's direct appeal rights is considered a first-time petition. **Commonwealth v. Figueroa**, 29 A.3d 1177 (Pa.Super. 2011).

* Former Justice specially assigned to the Superior Court.

determined S.K. had been sexually assaulted and had died as a result of having her throat slashed.

At some point during the investigation, police were informed appellant had come into possession of the murder weapon. On October 13, 2000, Pennsylvania State Police Trooper Barger contacted appellant at his place of employment in Struthers, Ohio. Police had a brief discussion with appellant at his job site. During this discussion, appellant informed police that on the evening of October 8, 2000, he was with S.K., William Monday, and David Garvey, the latter two who eventually would be charged in connection with the murder. Appellant told police that on the evening in question the group rode around in Monday's car, ate cheeseburgers, and played video games and that, at approximately 3:30 a.m. on the morning of October 9, 2000, he was dropped off at his house. Appellant told police he assumed S.K. was dropped off at some point thereafter.

At approximately 10:45 p.m. on October 13th, the date of the employment site interview, Trooper Barger telephoned appellant's place of employment. Barger asked appellant if he had forgotten to disclose any information during the conversation held earlier that day. He then asked whether appellant had been told by Monday that he and Garvey had killed S.K. after dropping off appellant during the early morning hours of October 9th. At this point, appellant asked Barger if he needed an attorney. Barger informed appellant that he did not need an attorney unless he was present when S.K. was murdered. After a momentary pause, appellant asked Barger a second time if he should seek representation. Barger reiterated his previous answer. Appellant then told Barger that Monday had admitted to the killing. Barger arranged to have appellant meet with investigators in person later that evening at the Struthers, Ohio, police station.

Approximately fifteen to twenty minutes after hanging up with Trooper Barger, appellant drove himself to the station. Once appellant entered the station house, both Trooper Barger and another officer—Pennsylvania State Police Corporal Melder—informed appellant he was neither under arrest nor being detained and, further, informed appellant he was free to leave at any point. Appellant, without being prompted to do so, then

- 2 -

reiterated he was with S.K., Monday, and Garvey on the evening of October 8th and described observing Monday, armed with a knife, grab S.K. from behind; he further described running out of a tunnel where S.K. was being held hostage while ignoring her screams; the rest of appellant's story, however, began to undergo drastic revision. Melder, recognizing appellant was on the verge of giving inculpatory statements, immediately interrupted and issued appellant *Miranda* warnings. The trial court found appellant considered these warnings and, in response thereto, stated to police that "maybe he should talk to an attorney." Police did not have probable cause at this point to arrest appellant. Consequently, he was permitted to leave the Struthers station without further discussion.

After leaving the Struthers station, appellant drove around for awhile and, ultimately, wound up at his mother's house. Corporal Ryhal, the third Pennsylvania State Police investigator assigned to the case, called appellant's mother's home on the morning of October 14, 2000, and spoke with appellant about coming to the New Castle Pennsylvania State Police Barracks for further discussion. Shortly after the conversation ended, appellant's mother drove him to the barracks.

Upon arriving, appellant again was told by police that he was free to leave. Nevertheless, appellant once again chose to voluntarily speak with police. Appellant was escorted to an interview room by Corporal Melder, who subsequently issued appellant a second set of *Miranda* warnings. Appellant testified at trial that, after considering the warnings, he knowingly executed a written waiver of his Fifth Amendment rights. Appellant then gave a harrowing account of the murder implicating Monday and Garvey. Appellant did not withdraw his consent at any point during the interview. At the conclusion of this account, appellant volunteered to take police to Hamilton Lake, where the murder weapon had been discarded.

Before driving appellant to the lake, Corporal Melder and Corporal Ryhal stopped at the Struthers police station to wait for the police divers to equip themselves for the impending search. At the station, appellant, who had not been handcuffed or placed under arrest, was given his *Miranda* warnings for a third time. Appellant did not request an attorney but continued to volunteer information. Shortly thereafter, appellant took the officers to

- 3 -

Hamilton Lake and directed them to where the murder weapon had been discarded. Police allowed appellant to freely wander around the lake and to personally instruct the divers as to where to search for the weapon. Appellant was not handcuffed at any point during the search.

Corporal Melder and Corporal Ryhal then took appellant back to the New Castle barracks. Upon arrival, appellant was given *Miranda* warnings for the fourth time. Appellant once again waived his Fifth Amendment rights. At this point, appellant graphically recounted the conspiracy and events leading up to S.K.'s murder and, in doing so, implicated himself in the crime. At approximately 7:30 p.m., appellant agreed to give a tape-recorded statement and was provided with a fifth set of *Miranda* warnings. Appellant again waived his Fifth Amendment rights and chose not to exercise his right to counsel and, instead, proceeded with the statement. The tape-recorded statement memorialized the everchanging and evolving statements given by appellant to investigators throughout the evening of October 13, 2000, and the following day.

The trial court summarized the manner in which the events leading up to and including S.K.'s murder unfolded as follows:

> On Sunday, October 8, 2000, the [appellant] returned home from work late in the afternoon. His friends, Monday and Garvey, arrived at his residence with [S.K.] in their vehicle. [Appellant] joined them in the vehicle because he had a small amount of marijuana in his possession and wished to "get high real quick." The men and [S.K.] began to drive around the Lowellville, Ohio area. They were attempting to convince [S.K.] to have oral sex with Garvey and locate a store where these men could purchase a "blunt" to use for smoking their marijuana. After finally obtaining their "blunt," the men drove to "Zombie Land" to partake of their marijuana.
>
> Upon reaching their destination, Monday parked the automobile on an old abandoned railroad bed near the culvert where [S.K.] was ultimately slain. [Appellant] then gave his knife, a large bladed

- 4 -

survival knife that he normally carried, to Monday so that Monday could properly prepare the "blunt" for smoking. The three men then began to smoke the marijuana. At this point, [appellant] and Monday exited the vehicle to talk. [S.K.] attempted to exit the vehicle, but Monday refused to permit her and instructed her to stay in the vehicle with Garvey.

The [appellant] and Monday walked approximately ten (10) feet from the vehicle and stopped. At this time, Monday told [appellant] that no one knew [S.K.] was with them and that this would be the perfect time to do what they had talked about; to rape and kill her. Monday was allowing [appellant] to make the decision. Whether [S.K.] was to live or die rested upon the [appellant] to decide yes or no. [Appellant] merely smirked in response to Monday's inquiry, but did not say no. The men then returned to the vehicle and proceeded to smoke the marijuana. As they sat in the vehicle smoking, Monday repeatedly inquired of [appellant], "yes or no?" [S.K.] told [appellant] to say, "yes." [Appellant] thought, "If [S.K.] knew what Monday meant, she would not be wanting [me] to say, 'Yes.'" Initially, [appellant] told Monday to wait, but [appellant], knowing the consequences of his response, finally told Monday "yes" and Monday ceased to ask the question.

After a while, [S.K.] inquired of the time and upon learning it was after seven o'clock p.m., informed the men that it was time for her to go home. Monday told her that she would have to go for a walk first. [S.K.] then told the men that she was on house arrest and that she would tell the police which would get them in trouble. At this point, Monday pointed [appellant's] knife at [S.K.] and threatened to "gut her like a fish" if she got them in trouble. Monday then began to drive very slowly out of "Zombie Land" and actually reached River Road, the main road that would lead back to Ohio. However, after reaching River Road, Monday put the vehicle in reverse. Monday backed the vehicle up the

railroad bed and parked in a location very near where the vehicle was parked initially.

Monday instructed everyone to exit the vehicle and they then proceeded to walk down a path that led to the culvert below the railroad bed, a distance of approximately two hundred (200) feet. The culvert is a half circle of concrete construction and forms a tunnel under the railroad bed. A small stream runs through it and covers approximately half of the area inside of the culvert. The other half is covered with rocks and dirt. The location of the culvert is secluded and it is impossible to view it without actually walking down to it. The path leading to the culvert is a very narrow dirt footpath crowded by vegetation and difficult to see. Even the [appellant] and his companions, knowing of its existence and location from previous visits to the area, had difficulty locating it.

As they started down the path that led to the culvert, [appellant] knew that [S.K.] was not coming back. Monday had informed [appellant] that, "If you tell me 'yes,' it's going to happen. She's not leaving." Once the group reached the culvert, Monday stopped the [appellant] at the entrance while [S.K.] and Garvey entered. Monday asked [appellant], "You said 'yes,' right?" To which the [appellant] replied, "Yes." The [appellant], though asked repeatedly, never said, "No."

The two men then entered the culvert and Monday went to speak with Garvey. After Monday spoke with Garvey, the three men and [S.K.] "hung out" for a short while. Garvey then got [appellant's] attention and the two talked privately. Garvey informed the [appellant] that Monday was going to hit [S.K.] to incapacitate her and that the [appellant] was to be ready to pull her pants down. The two men then returned to Monday and [S.K.] and proceeded to smoke the remaining marijuana from the "blunt."

- 6 -

A few other conversations subsequently ensued between the men that entailed some modifications of the details of what was to occur. At one point during these conversations, [S.K.] asked the [appellant] if Monday would really gut her. [Appellant] informed [S.K.] that Monday would not really gut her.

Shortly after these conversations, as [S.K.] was beginning to walk toward the [appellant], Monday grabbed her from behind. She fell back against Monday. He seized her and placed his left hand over her mouth and put [appellant's] knife to her throat. Monday then yelled, "Go, go!" Garvey then rushed to where Monday was and the [appellant] also moved forward and grabbed the waistband of [S.K.'s] pants. Monday forced [S.K.] to the ground and the [appellant] pulled her pants down. Garvey pulled down [S.K.'s] underpants. Garvey and Monday held [S.K.] down and Garvey pried her legs apart and held them open. Garvey told [appellant], "Go ahead. Go Ahead." [Appellant] told Garvey, "I can't do this. I can't. You do it." Garvey then unsuccessfully attempted to have intercourse with [S.K.]. At this time, [appellant] began to leave the culvert.

Monday insisted that [appellant] not leave the culvert, and [appellant] complied. Upon returning to the scene, the [appellant] observed [S.K.] still lying on the ground with Garvey at her feet and Monday kneeling near her head. Monday began to rise, but [S.K.] started to speak. Monday told her to shut up and placed his hand over her mouth. When Monday began to rise again, [S.K.] again began to plead with the men, but Monday, once again, told her to shut up and placed his hand over her mouth. A third time, [S.K.] began to plead with the men saying that she would willingly do what the men wanted, but Monday pressed the knife to her throat and told her that if she did not shut up, he would kill her. With this threat, [S.K.] fell silent.

[S.K.] was standing in front of Monday with her pants still pulled down. Monday was holding the knife to [S.K.'s] throat. Monday then pulled the knife across [S.K.'s] throat. [Appellant] started to leave the culvert, Monday began stabbing [S.K.]. Defendant heard [S.K.] say, "Oh, God." [Appellant] then heard a thump and [S.K.] whimper.

Monday told the [appellant] to return to the culvert, this time to recover the [appellant's] knife. Monday had dropped [appellant's] knife during the course of these events and used Garvey's knife to murder [S.K.]. [Appellant] located his knife, and after making sure that there was no blood on it, picked it up and placed it in the sheath on his belt. The men then left the scene. The men drove to a local gas station where [appellant] entered by himself and requested a key for the restroom. Upon learning that the restroom was already open, [appellant] informed Monday and Garvey of that fact. They entered and washed themselves while [appellant] waited in the car. The men drove to Monday's home where they stopped briefly. Monday and Garvey then dropped [appellant] off at his home. [Appellant] sat on the couch with his girlfriend's mother and father until his girlfriend returned home and they went to bed. At no time did the [appellant] attempt to contact the police.

Trial Court Opinion, Cox, J., 6/8/04, at 4-8.

After giving his tape-recorded statement, appellant was arrested and charged. He subsequently was transferred to the Lawrence County Prison pending arraignment. While languishing in prison, appellant asked to meet with a prison counselor. During a counseling session conducted shortly thereafter, appellant offered the counselor inculpatory statements, which the counselor noted in a report and which were passed along to the prison warden and, eventually, were passed from the warden to the district attorney. The counselor did not give appellant **_Miranda_** warnings before taking these statements.

Appellant was bound over for trial and on August 24, 2001, he filed an omnibus pretrial motion requesting suppression of the statements he had given to police after being issued his first set of **Miranda** warnings on the evening of October 13, 2000. Appellant's motion was denied on June 28, 2002, and trial commenced on January 28, 2003. On February 14, 2003, the jury returned its guilty verdicts and three days later, judgment of sentence was imposed.

On February 27, 2003, appellant filed a post-sentence motion which was denied on July 28, 2003. Appellant subsequently filed a timely notice of appeal. **See generally**, Pa.R.Crim.P. 720, **Post-Sentence Procedures; Appeal**, **(A)**(2)(a) **Timing**. He failed, however, to comply with the trial court's subsequent Pa.R.A.P. 1925 Order in a timely fashion and, as a consequence, we dismissed the forthcoming appeal on April 25, 2006. **Commonwealth v. Ricciardi**, 902 A.2d 981 (Pa.Super. 2006) (unpublished Memorandum); **see** Pa.R.A.P. 1925, **Opinion in Support of Order**, **(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court**.

On May 8, 2007, appellant filed a *pro se* Post Conviction Relief Act (PCRA) petition requesting reinstatement of his direct appeal rights *nunc pro tunc*. The PCRA court reinstated appellant's direct appeal rights on May, 22, 2007. Thereafter appellant filed a timely *nunc pro tunc* notice of appeal, which was amended at this Court's request on September 18, 2007.

**Commonwealth v. Ricciardi**, 953 A.2d 605 (Pa.Super. 2008) (unpublished memorandum at 1-11) (brackets in original) (internal citations omitted).

This Court affirmed Appellant's judgment of sentence, **id**., and our Supreme Court denied allowance of appeal. **Commonwealth v. Ricciardi**, 959 A.2d 319 (Pa. 2008). Appellant filed the underlying PCRA petition on October 16, 2009. The court appointed counsel who filed an amended petition. Ultimately, after multiple continuances, the PCRA court conducted

a hearing on May 4, 2011. The court subsequently held hearings on November 2, 2011, March 5, 2012, April 26, 2012, and February 7, 2013. After the parties submitted briefs on the matter, the court denied Appellant's petition on November 10, 2014. This timely appeal ensued. The PCRA court directed Appellant to file and serve a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant complied, and the court authored a Rule 1925(a) opinion. The matter is now ripe for this Court's consideration. Appellant raises the following issues for our review.

1. The trial court committed reversible error by denying the Petitioner's Petition for Post-Conviction Collateral Relief as trial counsel provided ineffective assistance of counsel that prejudiced the rights of the Petitioner and adversely affected and undermined the truth-determining process as demonstrated by the following:

   a. Trial counsel failed to object to the defective jury instructions presented to the jury on the charge of first degree murder and accomplice liability;

   b. Trial counsel failed to challenge the trial court's jury instruction that allowed a conviction on either theory of vicarious liability instead of demanding that the jury unanimously agree on the theory of liability that applied to Petitioner's conduct;

   c. Trial counsel failed to object to the instructions provided by the trial court regarding the sentence that could be imposed for the offense of murder charged against the Petitioner based on the theory of liability to the jury, or raise this issue at the time of the sentencing hearing, thereby allowing Petitioner to be illegally sentenced to [a] term of incarceration of life in prison without the possibility of parole in violation of the plain

language and legislative intent of 18 Pa.C.S.A. §
1102(c);

d. Trial counsel was not sufficiently and adequately
   qualified to represent the Petitioner and should
   have been declared per se ineffective;

e. Trial counsel failed to request the appointment of
   co-counsel or assemble a legal team to inspect
   evidence, interview witnesses, review case law,
   assist with trial preparation or provide general
   assistance throughout the course of the
   proceedings;

f. Trial counsel failed to request the appointment of
   an expert in the field of forensics to perform
   independent testing of the crime scene o[r] the
   evidence and provide testimony during the trial to
   rebut the testimony provided by the
   Commonwealth witnesses and buttress the
   theories of the defenses presented;

g. Trial counsel failed to request the appointment of
   an expert in the field of psychology to perform a
   review of the interview conducted on the
   Petitioner by the investigating officers and provide
   testimony to refute the Commonwealth's claim
   that the Petitioner made voluntary statements
   during such interview(s) or confirm the
   Petitioner's claim that his psychological condition
   at the time of the interview(s) was so impaired
   that he could not understand his right to
   terminate the interview, his right to counsel or
   voluntarily waive counsel;

h. Trial counsel failed to request sequestration of the
   jury during the course of the trial even though all
   local media outlets continuously printed and/or
   discussed the case, causing possible prejudice
   and bias to the jurors which could not be detected
   or learned by the Petitioner or his trial counsel
   during the course of the trial;

i. Trial counsel failed to seek out character witnesses that Petitioner notified him of prior to trial to aide in the establishment of a defense to the charges; and trial counsel had no legitimate strategy for such failure;

j. Trial counsel failed to adequately explain the elements of the charges brought forth against the Petitioner or provide a thorough explanation of the possible plea resolutions presented by the Commonwealth thereby preventing the Petitioner from making a knowing, voluntary and intelligent decision as to how to proceed in the case;

k. Trial counsel failed to request a change of venire even though then-District Attorney Matthew Mangino held a press conference providing details of the crime and identifying those individuals involved, and the local media outlets continued to publish details of facts relating to the case;

l. Trial counsel failed to raise proper objections during the course of the trial which allowed hearsay statements and otherwise unreliable and/or irrelevant evidence to be introduced to the jury, which included testimony of witness police officers referencing the statements of non-testifying co-Defendants, thereby causing irreparable prejudice to the Defendant;

m. Trial counsel, who also represented Petitioner on appeal, failed to draft the appellate brief in a clear and intelligent manner and in a form that allowed the Superior Court to understand and properly address the meritorious issues presented on appeal; thereby leaving such challenges unaddressed by the appellate court;

2. The trial court committed reversible error by denying the Petitioner's Petition for Post-Conviction Collateral Relief because a categorical, mandatory sentence of Life Without the Possibility of Parole is unconstitutional and in violation of the Eighth Amendment of the United States Constitution, Article 5 of the

Universal Declaration of Human Rights, and Article 1[,] section 13 of the Pennsylvania Constitution, particularly when a defendant is over the age of 17 but younger than the age of 25 when the offense was committed;

3. The trial court committed reversible error by denying the Petitioner's Petition for Post-Conviction Collateral Relief because a categorical, mandatory sentence of Life Without the Possibility of Parole is unconstitutional and in violation of the 14th Amendment of the United States Constitution because adult offenders are no less entitled to have mitigating considerations be applied to their individual cases than are their juvenile counterparts, particularly when age is not a statutory factor;

4. The trial court committed reversible error by denying the Petitioner's Petition for Post-Conviction Collateral Relief because the current statute that directs a sentence of Life Without the Possibility of Parole must be declared unconstitutional based on the Constitution and Laws of the United States and the Constitution and Laws of this Commonwealth and, therefore, the petitioner is entitled to a new trial with a "life-qualified jury" that must consider the Petitioner's age at the time of the offense during the sentencing process;

5. Trial counsel [sic] committed reversible error by denying Petitioner's Petition for Post-Conviction Collateral Relief because the Petitioner's conviction of First Degree Murder and subsequent sentence of Life Without the Possibility of Parole is inconsistent with the Commonwealth's theory of liability and imposes a sentence which greater than the lawful maximum that could be imposed against the Petitioner pursuant to 18 Pa.C.S.A. § 1102(c);

6. The trial court committed reversible error by denying Petitioner's Petition for Post-Conviction Collateral Relief because the statutes of this Commonwealth governing the qualifications of counsel in death penalty cases are constitutionally infirm and inconsistent with the requirements and protections afforded by the United States Code and the death penalty statutes of the majority of states;

7. The trial court committed reversible error by denying Petitioner's Petitioner for Post-Conviction Collateral Relief because the

statutes of this Commonwealth governing death penalty cases are constitutionally infirm and inconsistent with the rights afforded to capital defendants and the majority of states as demonstrated by the lack of a capital defendant's right to have notice of his right to be appointed at least two attorneys to represent his interests during the course of the proceedings.

Appellant's brief at 7-11.[2]

In reviewing a PCRA appeal, we consider the record "in the light most favorable to the prevailing party at the PCRA level." **Commonwealth v. Henkel**, 90 A.3d 16, 20 (Pa.Super. 2014) (*en banc*). In performing this review, we consider the evidence of record and the factual findings of the PCRA court. **Id**. We afford "great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record." **Id.** Accordingly, so long as a PCRA court's ruling is free of legal error and is supported by record evidence, we will not disturb its decision. **Id**. Where the issue presents a question of law, "our standard of review is *de novo* and our scope of review is plenary." **Id.**

Appellant's issues 1(a) through 1(m) pertain to the effectiveness of counsel. "To plead and prove ineffective assistance of counsel a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual

_____

[2] Although Appellant lists twenty issues, the argument section of his brief conjoins various issues together and he presents no argument for issues j, k, and l. Those issues are therefore waived.

prejudice resulted from counsel's act or failure to act." ***Commonwealth v. Stewart***, 84 A.3d 701, 706 (Pa.Super. 2013) (*en banc*). The failure to meet any of these aspects of the ineffectiveness test results in the claim failing. ***Id***.

A claim has arguable merit where the factual predicate is accurate and "could establish cause for relief." ***Id***. at 707. A determination as to whether the facts asserted present a claim of arguable merit is a legal one. ***Id***. In considering whether counsel acted reasonably, we do not use a hindsight analysis; rather, an attorney's decision is considered reasonable if it effectuated his client's interests. ***Id***. Only where "no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success[,]" will counsel's strategy be considered unreasonable. ***Id***. Finally, actual prejudice exists if "there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." ***Id***. It is presumed that counsel renders effective representation.

Appellant's initial claim is that trial counsel was ineffective for failing to object to the trial court's instructions on accomplice liability and first-degree murder. In support, Appellant relies on ***Commonwealth v. Bachert***, 453 A.2d 931 (Pa. 1982), ***Commonwealth v. Huffman***, 638 A.2d 961 (Pa. 1994), and distinguishes this case from ***Commonwealth v. Bennett***, 57 A.3d 1185 (Pa. 2012). In ***Bachert***, the issue on appeal did not involve a

challenge to a jury instruction, but a sufficiency of the evidence claim relative to accomplice liability. Bachert had been found guilty of first-degree murder and other crimes based on the shooting death of Thomas Welsh. Bachert and Charles Webber had been picked up hitchhiking by the victim. The men robbed the victim of his vehicle and shot him three times. After the crimes, the men attempted to sell the vehicle and informed several individuals that they had stolen the car and shot the driver. Three men testified that Bachert repeatedly stated, "We shot a guy."

This Court reversed Bachert's conviction, but the Supreme Court reversed that decision. In doing so, it opined that Bachert's repeated statements that "We shot a guy" were sufficient to prove a specific intent to kill. The **Bachert** Court reasoned, "[p]resented with defendant's admissions that "We stole a car" and "We shot a guy," admissions of participation, it was reasonable for the jury to infer that defendant's participation was, at a minimum, with the intent of facilitating the commission of the murder." **Bachert**, **supra** at 936.

In contrast, **Huffman** did involve a jury instruction issue. Therein, Huffman and his sole co-defendant were tried jointly for the murder of a man that occurred during a burglary at the co-defendant's place of employment. At trial, Huffman objected to trial court's jury instruction on vicarious liability, alleging that it failed to inform the jury that he must

- 16 -

possess the specific intent to kill in order to be found guilty of first-degree murder. The court had instructed the jury as follows.

> in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Id*. at 962. The **Huffman** Court held that the instruction improperly suggested that the jury could find a defendant possessed the requisite specific intent to kill based on the actions of an accomplice.

In **Bennett**, **supra**, our Supreme Court revisited **Huffman**, and reversed a decision of this Court that had granted Bennett a new trial. Bennett had conspired with four others to rob a jewelry store, and Bennett supplied a loaded handgun for the crime. Two of Bennett's cohorts entered the jewelry store while Bennett remained in a getaway car with another man. During the course of the robbery, one of the co-conspirators, Michael Mayo, shot and killed the victim. Mayo and another individual pled guilty to murder. Bennett and three other men were jointly tried in 1992, before **Huffman**, and there was no dispute that he was not the shooter. The trial court instructed the jury on first-degree murder, conspiracy and accomplice liability. During PCRA review, Bennett alleged that trial counsel was ineffective for not raising a **Huffman**-styled objection to the jury instructions.

- 17 -

After outlining the jury instructions in that case, the **Bennett** Court opined, "[w]hen the entire jury charge is considered, including the clear direction to the jury that it must find that each individual defendant had the specific intent to kill before that defendant could be convicted of first-degree murder, it is clear that the court complied with [**Bachert**]." **Bennett**, **supra** at 1200.

Appellant maintains that the instructions herein were confusing because they did not refer to Appellant having a specific intent to kill, and instead focused on the specific intent of the actual killer. In his view, the trial court's instruction permitted the jury to find him guilty based on the intent of William Monday, the individual who killed the victim. Appellant further attacks the court's instruction relative to conspiracy and highlights the distinction between the 2005 revised suggested standard jury instruction and the instruction the court provided in his case. Appellant points out that the 2005 suggested jury instruction set forth that a member of a conspiracy is not guilty of first-degree murder merely because he was part of a conspiracy to commit another offense. Rather, a conspirator also must have specific intent to kill in order to be found guilty of first-degree murder.

The court instructed the jury herein that it "may find the Defendant guilty of the crimes as a conspirator if you are satisfied beyond a reasonable doubt, first, that the Defendant agreed with Billy Monday and David Garvey that he or one or both of them would commit the crimes." N.T., 2/13/03, at

226. Appellant submits that the PCRA court's rationale that counsel could not be ineffective for failing to anticipate the change to the 2005 suggested jury instruction neglects to recognize that the change adopted the requirements of *Bachert* and *Huffman*.

The Commonwealth counters that *Bennett*, *supra*, should control. It argues that the jury was aware that Appellant did not stab the victim and that the actual killer was William Monday. The Commonwealth adds that the jury was not invited to infer that Appellant had specific intent to kill based on Monday's actions.

"[I]in reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, to ascertain whether the instruction fairly conveys the legal principles at issue." *Commonwealth v. Cook*, 952 A.2d 594, 626-627 (Pa. 2008). Conspiracy and accomplice liability instructions are not identical. *See Commonwealth v. Roebuck*, 32 A.3d 613, 622-623 (Pa. 2011) (recognizing difference between conspiracy and accomplice liability).

The trial court instructed the jury as to accomplice liability as follows:

> You may find the Defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime or even that he was personally present when the crime was committed. A Defendant is guilty of a crime if he is an accomplice of another person who commits that crime. A Defendant does not become an accomplice merely by being present at the scene or knowing about a crime. He is an accomplice if, with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages,

- 19 -

requests the other person to commit it or aides or agrees to aid or attempts to aid the other person in planning or committing it. However, a Defendant is not an accomplice if before the other person commits the crime, he stops his own efforts to promote or facilitate the commission of the crime and wholly deprives his previous efforts of effectiveness in the commission of the crime. You may find the Defendant guilty of a crime on the theory that he was accomplice and as long as you're satisfied beyond a reasonable doubt that the crime was committed and that the Defendant was an accomplice of the person who committed it.

N.T., 2/13/03, at 225-226.

Immediately thereafter, the trial court instructed the jury on conspiracy liability. The instruction reads,

A Defendant may, by reason of being a member of a conspiracy, become liable for a crime he did not personally commit. He may be found guilty under this conspiracy theory in some situations where he could not be convicted under an accomplice theory. You may find the Defendant guilty of the crime as a conspirator if you are satisfied beyond a reasonable doubt, first, that the Defendant agreed with Billy Monday and David Garvey that he or one or more of them would commit the crimes. Second, that the Defendant so agreed with the intent of promoting or facilitating the commission of the crime. Third, that while the agreement remained in effect, the crimes were committed by Billy Monday and David Garvey, and fourth, the crimes were committed by Billy Monday and David Garvey in furtherance of their and the Defendant's common design. If you find the Defendant guilty of either theory of accomplice or coconspirator, then you should convict him. It is not necessary that all jurors agree on the same theory or that all agree on whether this Defendant was an accomplice or coconspirator rather than the active perpetrator.

*Id*. at 226-227.

The court continued by instructing the jury, "It is the theory of the Commonwealth that the Defendant did not commit the actual act that killed [S.K.] but did so as an accomplice and/or as a coconspirator." *Id*. at 227.

- 20 -

Subsequently, after providing instructions relative to malice and being a direct cause of the victim's death, the court set forth in pertinent part,

> First degree murder is a murder in which the killer has the specific intent to kill. You may find the Defendant guilty of first degree murder if you are satisfied that the following three elements have been proven beyond a reasonable doubt. These are the three elements. First, that [S.K.] is dead; second, that the Defendant killed her; and third, that the Defendant did so with a specific intent to kill and with malice. A person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention.

*Id*. at 229-230.

Here, the trial court's instruction on first-degree murder did not clarify that Appellant was not required to be the actual killer. However, this inures to Appellant's benefit. The court's instructions on accomplice and conspiracy liability accurately reflected the law and in no manner violated **Bachert** or **Huffman**. Those instructions made clear that Appellant could be guilty of murder despite not having killed the victim, so long as he had the intent to commit murder. We agree with the Commonwealth that this case is closely analogous to **Bennett**, **supra**. In neither case was there a dispute as to whether the defendant actually killed the victim. The jury was instructed separately on conspiracy and accomplice liability. Those instructions did not suggest that the defendant could be convicted of murder under those theories without a specific intent to commit murder. Appellant's claim fails.

In his second and third issues, Appellant posits that trial counsel was ineffective in declining to object to Appellant's sentence of life imprisonment and the trial court's instruction on conspiracy. Appellant contends that the trial court erred by instructing the jury that it was not required to unanimously agree on the same vicarious liability theory. According to Appellant, this instruction resulted in no specific finding of vicarious liability in his case. Appellant extrapolates that, because the jury did not make a specific finding regarding his vicarious liability, it inures to his benefit and it should be presumed that he was found guilty as a conspirator. He continues that under 18 Pa.C.S. § 1102(c),[3] a defendant found guilty of conspiracy to commit murder is only subject to a term of incarceration of twenty to forty years.

Appellant maintains that, although conspiracy liability for first-degree murder exists, those cases upholding a life sentence under such a theory did not address § 1102(c). Under Appellant's theory, § 1102(c) required him to

_____

[3] 18 Pa.C.S. § 1102(c) provides,

> Notwithstanding section 1103(1) (relating to sentence of imprisonment for felony), a person who has been convicted of attempt, solicitation or conspiracy to commit murder, murder of an unborn child or murder of a law enforcement officer where serious bodily injury results may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 40 years. Where serious bodily injury does not result, the person may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 20 years.

- 22 -

be sentenced to no more than forty years incarceration for the murder count. Appellant insists that permitting him to be sentenced to life imprisonment results in § 1102(c) becoming meaningless because the Commonwealth can charge a defendant with murder and seek a conviction based on conspiratorial liability.

The Commonwealth responds that Appellant has offered no case law in support of his position that his sentence should not have exceeded forty years. It further opines that the trial court provided the then-prevailing suggested standard jury instruction relative to vicarious criminal liability and that instruction adequately explained the law relative to vicarious liability. Finally, the Commonwealth maintains that trial counsel could not be ineffective in failing to request that the court instruct the jury to specify which theory of vicarious liability it used to determine guilt because counsel cannot be ineffective for failing to create procedure.

It is well-settled that counsel cannot be deemed ineffective for failing to anticipate a change in the law. **Bennett**, **supra** at 1201 ("counsel will not be faulted for failing to predict a change in the law."). Similarly, counsel is not ineffective for not advancing a novel position that would result in a significant change in the law. The reason Appellant cannot marshal any legal support for his position is because there is none. Adult individuals found guilty of first-degree murder are subject to at least a sentence of life imprisonment without parole, even if the person is found guilty based on

vicarious liability. Appellant's argument that this renders moot the punishment for conspiracy to commit murder overlooks that a person could still be charged and found guilty of conspiracy to commit first-degree murder where the victim is not killed, and the defendant conspired to commit a murder. In that situation, a defendant would not be guilty of first-degree murder. Hence, 18 Pa.C.S. § 1102(c) is not superfluous simply because a person can be found guilty of murder based on conspiratorial liability. Appellant's position is without arguable merit.

The next argument Appellant levels on appeal encompasses his issues 1(d)-(g), as well as issue 1(i). Specifically, he argues that counsel was ineffective in declining to secure funding for pre-trial preparation, including for securing expert witnesses, failing to request the appointment of additional co-counsel, and not presenting character witnesses. Appellant first attacks his trial counsel as an inexperienced death penalty attorney whose inexperience resulted in an unreliable adjudication of guilt.[4] In his view, counsel's lack of experience and failure to request the appointment of an additional attorney resulted in *per se* ineffectiveness.

Appellant cites a litany of rules and regulations from other states and the federal courts regarding capital representation as well as guidelines from

_____

[4] Appellant's case was tried as a death penalty case; however, the jury did not return a verdict in favor of death.

the American Bar Association. According to Appellant, Pennsylvania's scheme for appointment of death-qualified trial attorneys is so deficient that individuals who meet the minimum criteria for death penalty cases cannot effectively represent his client.

With respect to Appellant's position that trial counsel was *per se* ineffective in failing to secure co-counsel, the Commonwealth notes that trial counsel had eight years of experience as a public defender and twenty years of litigation experience. It also asserts that the Pennsylvania Supreme Court has upheld capital convictions where one attorney tried the case.

Counsel is considered *per se* ineffective "where there was an actual or constructive denial of counsel, the state interfered with counsel's assistance, or counsel had an actual conflict of interest." ***Commonwealth v. Reaves***, 923 A.2d 1119, 1128 (Pa. 2007). In ***Commonwealth v. Britt***, 83 A.3d 198 (Pa.Super. 2013), we marshalled case law discussing when counsel has been held to be *per se* ineffective, stating:

> In ***Commonwealth v. Halley***, 582 Pa. 164, 870 A.2d 795 (Pa. 2005), our Supreme Court concluded that counsel who fails to file a Pa.R.A.P. 1925(b) statement for purposes of a first as-of-right direct appeal is per se ineffective. ***Compare Commonwealth v. Hill***, 609 Pa. 410, 16 A.3d 484 (Pa. 2011) (failure to file a 1925(b) statement for purposes of capital PCRA review resulted in waiver). Similarly, in ***Commonwealth v. Burton***, 2009 PA Super 87, 973 A.2d 428 (Pa.Super. 2009), this Court determined that counsel's filing of an untimely Pa.R.AP. 1925(b) statement was per se ineffective.
>
> In addition, the failure to file a requested petition for allowance of appeal, ***Commonwealth v. Liebel***, 573 Pa. 375,

825 A.2d 630 (2003), or neglecting to file a requested direct appeal, **Commonwealth v. Lantzy**, 558 Pa. 214, 736 A.2d 564, 572 (1999), has been considered to be a constructive denial of the right to counsel. The Pennsylvania Supreme Court also has opined that the failure to file an appellate brief constitutes abandonment of counsel and is a newly-discovered fact for purposes of PCRA timeliness considerations. In the PCRA arena, where counsel fails to file either an amended PCRA petition or a Turner/Finley no-merit letter, we have determined that counsel constructively denied his client representation. **See Commonwealth v. Burkett**, 2010 PA Super 182, 5 A.3d 1260, 1277 (Pa.Super. 2010) (collecting cases). These situations all involve representation so deficient that the defendant was either completely or constructively denied counsel or entirely denied meaningful merits review.

**Britt**, **supra** at 202-203. The **Britt** Court continued, "where the arguments involve an attorney's failure to adequately prepare based on neglecting to substantively meet with his client, interview witnesses, or investigate the matter, counsel is generally not considered *per se* ineffective." **Id**. at 203. Here, Appellant was not constructively or completely denied meaningful representation due to having one attorney rather than two. Appellant's claim that trial counsel was *per se* ineffective for not seeking additional representation is without arguable merit.

Additionally, Appellant faults counsel for not seeking funding to procure an expert in psychology or forensic investigator. He submits that a psychological expert would have aided with his assertions that his taped confession was the product of coercion and undue influence. Appellant posits that he was a young, emotional, sleep deprived and easily manipulated individual, who was unfamiliar with the criminal justice system.

Similarly, Appellant contends that a forensic investigator would have been able to show that his tape-recorded confession had been erased and re-recorded to reflect statements more in accordance with police directives.

The Commonwealth counters that Appellant has failed to identify any expert who would have testified on behalf of Appellant. It points out that counsel cannot be found ineffective for not finding an expert that has not been shown to exist. Where the issue involves an attorney's failure to call a witness, the petitioner must prove: (i) the witness existed; (ii) the witness was available to testify; (iii) counsel knew of, or should have known of, the existence of the witness; (iv) the witness was willing to testify; and (v) the absence of the testimony was so prejudicial as to have denied the defendant a fair trial. ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1143 (Pa. 2011); ***Commonwealth v. Cox***, 983 A.2d 666, 692 (Pa. 2009).

Appellant's argument pertaining to trial counsel's alleged failure to call expert witnesses or elicit funds for expert witnesses fails because he has not established either the identity of the proposed witnesses or what testimony they would provide. Appellant also contests trial counsel's failure to present character witnesses on his behalf. In support, he relies on ***Commonwealth v. Weiss***, 606 A.2d 439 (Pa. 1992). In ***Weiss***, the defendant was convicted of rape, statutory rape, incest, indecent assault, simple assault, endangering the welfare of children and corruption of minors. The charges stemmed from an allegation that he put his finger and penis into his four-year-old

daughter's vagina, put Cheerios in her vagina, and cut her in her genital area with a plastic knife. The defendant also allegedly pointed a gun at the victim when she screamed.

The victim's mother, who was estranged from the father, discovered a one-inch cut in her daughter's vaginal area when bathing her. A doctor testified that the cut was consistent with being caused by a plastic knife. Two nurses also testified regarding the cut. The defendant presented his two roommates, two children of the roommates, and himself. The defendant's father also testified that the victim had recanted. The defense did not present any character evidence. On direct appeal, our Supreme Court determined that the failure to present character witnesses was ineffective assistance. In concluding the issue had arguable merit, the **Weiss** Court stated, "where there are only two direct witnesses involved, credibility of the witnesses is of paramount importance, and character evidence is critical to the jury's determination of credibility. Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty." *Id*. at 442.

The Court then determined that counsel's decision not to present character witnesses "was not a tactical one made after weighing all of the alternatives, but was based on the fact that he had failed to interview and prepare potential character witnesses, and consult with his client thereto."

*Id*. at 443. Finally, the **Weiss** Court held that the defendant established prejudice, stating,

> Whereas the defense did not attempt to refute the physical findings, the evidence regarding the perpetrator boiled down to appellant's word against the word of his wife and daughter. The only issue then, was whether appellant or someone else was responsible for what happened. Considering there was no overwhelming evidence of guilt in this case, credibility of the witnesses was of paramount importance, and counsel's error not to employ character witnesses, familial or otherwise, undermined appellant's chances of instilling reasonable doubt in the minds of the jury and resulted in prejudice to appellant.

*Id*. (footnote omitted).

Appellant asserts that character witnesses were available, although he does not identify them, and that they could have offered testimony that would have refuted the Commonwealth's theory that Appellant had a long-standing and well-thought out plan to commit the crimes herein. He concludes by stating that failing to find counsel ineffective will "leave a twenty year old child imprisoned for the remainder of his natural life." Appellant's brief at 41.

The Commonwealth responds by highlighting that Appellant did not reference the proposed testimony of any potential character witness and did not present in his petition or hearings such testimony. As previously discussed, a failure-to-call-a-witness claim requires the petitioner to at least proffer who the witnesses are and what their testimony would be. Appellant has failed to meet even the basic elements of a failure to call a witness

claim.  Accordingly, his issue fails.  Further, his reliance on **Weiss**, **supra**, is grossly misplaced.  That case involved a matter where the defendant's guilt hinged on the credibility of his accuser.  The evidence in this matter implicating Appellant is far more significant than that in **Weiss**.

Appellant's next claim is that appellate counsel was ineffective by filing a deficient brief in his reinstated direct appeal.  Appellant highlights that the prior panel in this matter chastised counsel for the inadequacies of his brief.  In Appellant's view, appellate counsel's brief was so deficient that this Court "was unable to address the meritorious challenges available[.]"  Appellant's brief at 41.  He continues that the panel either mischaracterized his arguments or did not address the merits of his position.  Appellant maintains that one need only read this Court's prior opinion to determine that appellate counsel was ineffective.

Appellant does not actually provide argument relative to the issues he advanced on direct appeal that he believes would show that his conviction was infirm.  Instead, he chastises the PCRA court for concluding that, because this Court addressed the issues Appellant raised, he was not entitled to relief.  Appellant argues, without legal support, that he is entitled to the reinstatement of his direct appeal rights.

The Commonwealth rejoins that while this Court critiqued Appellant's brief, he was not constructively or completely denied counsel during his direct appeal.  It notes that this Court addressed the issues Appellant raised

and decided his appeal on the merits. The Commonwealth relies on **Commonwealth v. Hutchinson**, 25 A.3d 277 (Pa. 2011), for the proposition that where a petitioner alleges that appellate counsel ineffectively raised certain claims, but does not develop how counsel should have addressed the issues, he is not entitled to relief.

A petitioner is not entitled to reinstatement of his appellate rights where this Court addressed the merits of some of his issues raised in his direct appeal. **Commonwealth v. Burkett**, 5 A.3d 1260, 1271 (Pa.Super. 2010); **Commonwealth v. Pulanco**, 954 A.2d 639 (Pa.Super. 2008). As we outlined in **Burkett**, "our Supreme Court has held that the filing of a deficient brief does not warrant a presumption of prejudice. **Commonwealth v. Reed**, 601 Pa. 257, 971 A.2d 1216 (Pa. 2009)." **Burkett**, **supra** at 1271. Only where the brief is so deficient that this Court cannot conduct any review of the issues presented is counsel considered *per se* ineffective, entitling the petitioner to reinstatement of his appellate rights without a showing of actual prejudice. **See Commonwealth v. Fink**, 24 A.3d 426 (Pa.Super. 2011); **Commonwealth v. Franklin**, 823 A.2d 906 (Pa.Super. 2003). Since Appellant was not completely denied appellate review and he fails to advance any argument relative to the issues that he believes were ineffectively briefed during his appeal, he is not entitled to relief.

Appellant's remaining claims, except for his final issue, all pertain to the legality of his sentence of life imprisonment without parole. First, Appellant asserts that a sentence of life imprisonment without parole violates his Eighth and Fourteenth Amendment rights. Appellant argues that the United States Supreme Court plurality decision in ***Woodson v. North Carolina***, 428 U.S. 280 (1976) (plurality), when read in conjunction with ***Miller v. Alabama***, 132 S.Ct. 2455 (2012), precludes a mandatory sentence of life imprisonment without parole.

In ***Woodson***, a plurality of the United States Supreme Court determined that a mandatory sentence of death for a first-degree murder violated the Eighth Amendment.[5] In ***Miller***, ***supra***, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishment.'" ***Id***. at 2460. In doing so, the ***Miller*** Court relied on two separate lines of precedent. The Court reasoned,

> The cases before us implicate two strands of precedent reflecting our concern with proportionate punishment. The first has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. ***See Graham***, 560 U.S., at ––––, 130 S.Ct., at 2022–2023 (listing cases). So, for example, we have held that imposing the death penalty for nonhomicide crimes against

_____

[5] Three justices agreed in the rationale and Justices Brennan and Marshall concurred and would have held that the Eighth Amendment prohibits the death penalty under all circumstances.

individuals, or imposing it on mentally retarded defendants, violates the Eighth Amendment. *See Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Several of the cases in this group have specially focused on juvenile offenders, because of their lesser culpability. Thus, *Roper* [*v. Simmons*, 543 U.S. 551 (2005),] held that the Eighth Amendment bars capital punishment for children, and *Graham* concluded that the Amendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense. *Graham* further likened life without parole for juveniles to the death penalty itself, thereby evoking a second line of our precedents. In those cases, we have prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Here, the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.

*Id*. at 2463-2464.

The Court reiterated its *Roper* and *Graham* observations that juveniles are emotionally and mentally different from adults in key respects, rendering them more amenable to rehabilitation. It then stated that the *Graham* rationale "implicates any life-without-parole sentence imposed on a juvenile[.]" *Id*. at 2477. It further compared mandatory life without parole sentences for juveniles to the death penalty and considered them closely analogous. In conclusion, the majority stated, "*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must

have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." ***Id***. at 2475.

Appellant relies on ***Miller***, ***supra***, and contends that its rationale applies equally to adult defendants who are twenty-one years old and under. Appellant posits that modern science demonstrates that at the time he committed the crime, his brain was not fully developed because he had not yet attained the age of twenty-five. He notes that a person must be twenty-five years old to be elected to the United States House of Representatives and the Pennsylvania State Senate. Appellant adds that a person must be twenty-one years of age to serve as a Pennsylvania state representative and purchase and consume alcohol. He also posits that most rental car agencies require a person to be at least twenty-five years old to rent a car. Thus, Appellant maintains that 42 Pa.C.S. § 9711, governing sentencing procedures in capital cases, is unconstitutional under both the federal and Pennsylvania constitutions.

There is little dispute that the original meaning of the cruel and unusual punishments clause prohibited only torturous methods of punishment. ***See Harmelin v. Michigan***, 501 U.S. 957, 979 (1991). As Justice Thomas noted in his dissenting opinion in ***Graham***, that understanding was applied "for nearly 170 years after the Eighth Amendment's ratification." ***Graham, supra*** at 2044 (Thomas, J. dissenting). There is no evidence that the clause was originally understood

to prohibit life sentences or even the death penalty.  **See Harmelin**, **supra** at 975-985.  Of course, the High Court has expanded its Eighth Amendment jurisprudence to reflect what it has labeled as evolving standards of decency. **See Trop v. Dulles**, 356 U.S. 86, 101 (1958) (plurality opinion of Warren, C.J.).

The United States Supreme Court has delineated that a court must consider "objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue."  **Graham**, **supra** at 2022 (citing **Roper**, **supra** at 572 (2005)) (internal quotations omitted).  In addition, a court "must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." **Id**.

No state court or federal court has seen fit to reject as unconstitutional mandatory life without parole sentences for adults convicted of homicide because they have not yet attained the age of twenty-five. Neither **Woodson** nor **Miller** hold that mandatory life imprisonment sentences for adult homicide defendants are unconstitutional.  Moreover, the Pennsylvania Supreme Court has declared that "novel" Eighth Amendment claims do not entitle PCRA petitioners to relief.  **Commonwealth v. Robinson**, 82 A.3d 998 (Pa. 2013).  Accordingly, Appellant's issue fails.

Appellant's final claim is similar to arguments he advanced with respect to trial counsel being *per se* ineffective. Appellant sets forth that Pa.R.Crim.P. 801, governing death qualified attorneys, affords lesser protections than federal law, since federal law requires a capital defendant to be told that he has the right to two appointed lawyers. He proffers that there is no evidence that trial counsel ever represented a person charged with murder, yet he met the minimum Pennsylvania requirements of being death penalty certified. In his view, Pennsylvania's requirements for death penalty attorneys violates the Sixth and Fourteenth Amendments as well as Article I, § 9 of the Pennsylvania Constitution.

The Commonwealth acknowledges that federal statutory law mandates the appointment of two attorneys in federal capital cases, but posits that the law is not a constitutional requirement. It maintains that trial counsel satisfied the requirements of capital counsel at the time of Appellant's trial and that the current version of Rule 801 does not apply retroactively.

To the extent that Appellant does not raise this issue under the rubric of ineffective assistance of counsel, it is waived. 42 Pa.C.S. § 9544(b). Moreover, Appellant fails to cite any legal authority for the proposition that failure to have the assistance of multiple attorneys during a capital case violates the federal and state constitutional requirements that counsel be appointed. Thus, his position fails for this additional reason.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/18/2015